732 So.2d 773 (1999)
Richard Patrick LONG, Plaintiff/Appellant,
v.
Catherine West DOSSETT, Defendant/Appellee.
No. 98-1160.
Court of Appeal of Louisiana, Third Circuit.
April 28, 1999.
Writ Denied June 4, 1999.
*774 Helen Scott Johnson, Jennifer Stuller Nehrbass, Lafayette, for Richard Patrick Long.
Gordon Peter Sandoz II, Francis A. Olivier III, Sunset, for Catherine West Dossett.
BEFORE: DOUCET, C.J., SAUNDERS, AND SULLIVAN, Judges.
SAUNDERS, Judge.
This appeal arises from a child custody proceeding wherein the lower court rendered judgment in favor of the mother of her minor child. Winter Jade Long is the *775 minor child of Richard Patrick Long, hereinafter "Appellant," and Catherine West Dossett, hereinafter "Appellee." After a trial on the merits, the trial judge granted joint custody to both parties with Appellee assigned domiciliary parent. Upon review, we maintain the joint custody rule and affirm the designation of Appellee as domiciliary parent.

FACTS
Winter Jade Long was born on December 18, 1992. On October 6, 1995, by a child custody order, Appellant and Appellee were granted split domiciliary status over Winter based on stipulations made by the parties. As per the order, each parent enjoyed custody over Winter for six months of each year until Winter reached school age, whereupon a new plan was to be implemented. Winter has now reached school age, and each parent seeks sole custody over the minor child or, in the alternative, primary domiciliary status under a joint custody plan. After a trial on the merits, the trial court ordered that the parties shall have joint custody over Winter, with Appellee designated as primary domiciliary parent.

LAW AND ANALYSIS

A. ASSIGNMENT OF ERROR NO. 1

Appellant argues that the trial judge operated under an error of law, and therefore, on appeal, the evidence presented at trial should be reviewed de novo. In Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98); 708 So.2d 731, the supreme court performed a de novo review when it found that the trial court misapplied La. Civ.Code art. 131. The trial court made its analysis under the old presumption that joint custody is in the best interest of the child. The 1993 amendments to La.Civ. Code art. 131 removed that presumption, and therefore the standard was applied erroneously, making a de novo review necessary. Citing Evans, Appellant argues that legal error was made in the matter before us when the trial judge failed to view the factors of La.Civ.Code art. 134 as a whole and, instead, placed too much emphasis on the relationship between Winter's parents. We note, the Evans court made no mention of La.Civ.Code art. 134; rather, its discussion focused on La.Civ. Code art. 131 and the effects of the amendments thereto. Nevertheless, it is true, as Appellant asserts, that La.Civ. Code art. 134 factors are nonexclusive and the weight given to each factor is left up to the discretion of the trial court. La.Civ. Code art. 134, Comment (b). In his Ruling and Order, the lower court cited La. Civ.Code art. 131 and Muller v. Muller, 94-281 (La.App. 3 Cir. 10/5/94); 643 So.2d 478, when it stated that it must consider the best interest of the minor child. Appellant asserts that the lower court's citation of Muller somehow indicates that the trial court inappropriately applied La. Civ.Code art. 134 factors to this matter. The trial court listed the factors of La.Civ. Code art. 134 and explained:
The trial of this matter consisted of almost eight days of testimony and the introduction of approximately sixty exhibits. The court then interviewed the child in chambers, not as to her preference, but in an effort to test the credibility of some of the trial testimony.
Appellant's request for a de novo review is premised on a mere allegation that because the lower court granted domiciliary status to Appellee, who focused much of her argument on the relationship between the parents, the trial judge committed legal error under La.Civ.Code art. 134 by focusing on the parents and not Winter's best interest. We find this conclusion unsupported by the record and find no legal error therein. Accordingly, a de novo review is unnecessary.

B. ASSIGNMENT OF ERROR NO. 2

Appellant asserts that the lower court abused its discretion and manifestly erred when it appointed Appellee as domiciliary parent. It is well settled that the fact *776 findings of a trial court or jury will not be disturbed on review absent a finding of clear or manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989). Considering the review of a child custody order, Justice Tate explained in Fulco v. Fulco, 259 La. 1122, 1129, 254 So.2d 603, 605 (La.1971):
Upon appellate review, the determination of the trial judge in child custody matters is entitled to great weight. He is in a better position to evaluate the best interests of the children from his total overview of the conduct and character of the parties and the children and of community standards. His discretion on the issue will not be disturbed on review in the absence of a clear showing of abuse thereof.
In the present matter, the trial court's order was made necessary by the 1995 custody arrangement which made modification necessary once Winter reached school age. The need to alter the custody agreement when Winter reached this age was foreseen by the 1995 trial court and provided for in the language of its order which granted equal joint custody to the parents "until the minor child begins school at which time the parties shall submit a new implementation plan in writing or submit the issues to the Court." The record indicates that the earlier order was made pursuant to a stipulated agreement; hence, the 1995 order is not a "considered decree," therefore the heavy burden of a showing that the present custody arrangement is "so deleterious to the child" or a showing that the harm of change is substantially outweighed by its advantages need not be made by the movant. Hensgens v. Hensgens, 94-1200, p. 5 (La.App. 3 Cir.); 653 So.2d 48, 52, writ denied, 95-1488 (La.9/22/95); 660 So.2d 478, citing Bergeron v. Bergeron, 492 So.2d 1193 (La.1986). However, even pursuant to a consent decree, "a material change of circumstances since the original custody decree was entered and that the proposed modification is in the best interest of the child" must be shown. Hensgens, p. 6, 653 So.2d at 52. We find, as did the lower court, Winter's having reached school age readily rises to a material change in circumstance which, in the best interest of Winter, requires a revised custody agreement.
We now consider the record to determine whether the lower court abused its discretion in granting domiciliary status to Appellee. La.Civ.Code art. 134 provides a nonexclusive list of factors to guide a court's determination of a child's best interest, to wit:
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing of proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage *777 a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
The extensive record indicates testimony that touches on nearly every aspect of the La.Civ.Code art. 134 considerations. We now consider the wealth of evidence and testimony presented at trial that both supports and denigrates Appellee and Appellant.

1. Expert Testimony
Priscilla Kleinpeter, a marriage and family therapist, testified about her interview with Winter:
In asking her to describe a typical day, this was over approximately the two hour period, when she was comfortable, she said that she got up and went to day care, that her mom would take her sometimes, but if her mother was sleeping, she would go in a cab, that she was fearful of the cab, that she didn't like going in the cab.
She said that after day care, she then went to her mother's bar and she stayed there untilplayed pool and talked to people in the bar until it was time for her to go home. She said then that one of her mother's boyfriends would take her home and tuck her in bed until her mom came home.
Ms. Kleinpeter noted at trial that during her evaluation of Winter, when asked who took care of her mostly when she was at her mom's, she replied "Tommy takes me home from Mom's work and keeps me." When asked who gives her a bath, Winter replied that "Dad helps me," and that at her mom's, "I take a bath by myself. Mommy and Tommy take a shower together." Kleinpeter also noted that Winter told her that Mommy and Tommy [Appellee's fiancé] act silly. Winter explained that her Dad took care of her. It was apparent to Kleinpeter that Winter felt she could depend on her father. Kleinpeter stated in court that Winter told her that "Mom smokes cigars. They're bad for you. Mom throws up a lot." Winter told Kleinpeter that Leah [a babysitter] takes care of her and fixes her breakfast and supper when she is at her mother's home; Dad fixes her breakfast when she is with him. Kleinpeter determined Appellant to be a superior father, noting:
Because of the emotional connection, the emotional concern and worry that he has with, for Winter, because of the little things; for example, Winter talking about how Dad blow drys her hairand the way she laughs when she talked about that. The number of the activities that he has her in, his reliability as far as keeping appointments, just his general concern. The way that she's groomed when she comes to the office, the way that she approaches him, the trust, the comfort that she shows with him.
When describing a video tape that she viewed, Kleinpeter commented,
I think probably the most striking aspect was the way that they parted. A child that age who is going away with their dad for at least some number of days, and there was no sense of separation, discomfort, no sense of sadness, no sense of wanting to cling to Mom, no sense of, "A.m. I going to see you again?" She had a smile on her face. Those are my primary concerns.
Dr. Luke Elliott, Jr., a clinical-child psychologist who testified at trial as the court appointed health professional, in his evaluation report of January 12, 1998, found that Winter has serious loyalty conflicts. His summary impressions, in pertinent part, are as follows:
Based on multiple-contacts with Winter and multiple conversations with her parents and contracts [sic] with her teachers and a therapist in Amarillo as well as a review of several depositions of the parties of this case, it is concluded that Winter's emotional and psychological needs are better met by her father. *778 Winter's external behavioral adjustment supports this and personality measures indicate the increasing security would be necessary to support these behavioral changes.
When she was exclusively in Appellant's custody, in May and June of 1997, Dr. Elliott reported that Winter was anxious, mildly depressed, and irritable. His first visit with Appellee and Winter was July 18, 1997, nine days after Winter had arrived from having been with her father for nine months. Dr. Elliott saw Winter and Appellee on October 27, 1997, when she was still in the custody of Appellee and still in her Louisiana environment, yet the meeting involved mostly Appellee relating her concerns to the doctor, and not much content was received from Winter; at that time, however, Dr. Elliott noted that Winter said positive things about returning to Amarillo and that she appeared comfortable with the idea.
On November 21, 1997, Appellant and Winter saw Dr. Elliott. Winter was ill with a cold so Dr. Elliott saw her for about fifteen minutes within which time he noticed that her drawings were calmer. He reported that Winter seemed insecure with some aggression when he saw her with her mother that following December 22, 1997. Dr. Elliott explained that he had no indication from anyone that Appellant had ever been violent towards Winter. He noted in his report that Winter expressed no concern over her father telling her the truth, but she was concerned about her mother telling her the truth. Dr. Elliott testified that his conclusion that Winter would be better placed with her father was based primarily on his observations of the child and the parents, along with the comments of the other treating therapists and the teachers. During Dr. Elliott's testimony at trial, Dr. Elliott acknowledged that he understood Appellant drove for eighteen months with a suspended license, and during this time he drove Winter with him. He also testified that his focus was not on what the parents said about each other, but on the best interest of the child, and nothing indicated that any of the wrongful acts alleged, with the exception of Appellant driving with a suspended license, occurred in front of the child. Dr. Elliott explained:
Winter appears more comfortable with her father, that she looks more mature and emotionally settled around her father; that that's supported by the school teacher observations of Winter's typical day-to-day behavior, by Ms. Kleinpeter's observations and comments of the areas that she explored and talked to with Winter. And that by contrast, and it is admittedly a small contrast, there is more aggression, standoffishness, there's a general sense that she is just not as comfortable and secure in the times that I'd see her on closely-related contacts with her mother.
Dr. I.J. Gaudet, Jr., in his Report of Psychological Examination, January 7, 1998, found no dynamics in the profiles in either party to contradict their ability to perform the role of parent.

2. Appellant
Appellant has Winter enrolled in the Amarillo Montessori Academy which she attends from approximately 8:30 a.m. to 3:00 p.m. every weekday. In the mornings, the evidence indicates that Appellant takes her to work at either of his businesses, Clean Right Dry Cleaners or Master Draperies, where he prepares lunch for Winter. She takes gymnastics on Tuesdays and Thursdays from 4:30 p.m. to 5:30 p.m.. On other afternoons, Appellant takes Winter with him to finish errands associated with his business or to the park or zoo. The record indicates that he does not leave her with babysitters. Appellant and Winter have extensive family in Amarillo, including Winter's grandparents, aunt, uncle and cousins.
At trial, Appellant's testimony regarding his limiting Appellee's phone contact with Winter is not compelling. He simply stated that Appellee called too late or Winter *779 was sleeping or taking a bath. Appellee introduced evidence that during Appellant's second custodial period, November 1, 1996, through July 9, 1997, she attempted to call Winter fifty-four times from her home and Appellant allowed her to speak with Winter only once. The telephone records produced by Appellee had many other calls scratched out, making them indecipherable. Appellant testified that in November of 1997, he and Winter were in town for three days for the initial visit with Dr. Elliott, but he did not allow Winter or Appellee to communicate to one another because, as per Dr. Elliott's recommendations, he was trying not to contaminate the visit so that Dr. Elliott could see Winter as she naturally is with him. Winter was in town the week before trial, and Appellant did not allow contact with Appellee. Appellant admitted at trial that he called Appellee many curse words to harass her, yet he denied ever telling Winter that her mother was a liar. Appellant also admitted that in April, 1997, he told Appellee that she would never see Winter again. Appellant explained, when asked if he knew that Appellee was afraid to see him alone, that this was not true because they had met alone on several occasions to discuss the stipulations that went into the 1995 custody judgment. In court, Appellant acknowledged that twice in July, 1997, Winter appeared reluctant to go with him; he opined that Appellee had Deputy Charlie Barton present at those times as a set up to witness Winter's reluctance, not to act as a bodyguard since her fiancé was also present.
Several witnesses gave testimony that supported Appellant's version of the facts. Von Dell Knorpp, a pre-school classroom director with the Montessori School in Amarillo, gave testimony indicating Appellant brings and retrieves Winter from school each day. Knorpp explained that Winter always arrives appropriately dressed and brings wonderful lunches. She noted that Winter is outgoing and gets along well with other children. Knorpp described Appellant as interested, receptive and attentive to events at the school.
Teresa Hillary has cleaned Appellant's house once every other week for about sixteen months. She stated that Appellant's house is kept up in between her visits and is not hard to clean. She noted that Winter had a lot of her art hanging on her bedroom walls.
Howard Christopher Heyworth, who owns and operates Washbrite Laundry & Cleaners in Amarillo, explained at trial that he has a professional relationship with Appellant and has known both Appellant and Winter for two years. Heyworth stated that Winter is usually with Appellant every morning and afternoon when he picks up clothing for cleaning. Heyworth described Winter as fun loving, outgoing, always properly dressed and playful with Whiskers, his cat. He noted that Appellant was patient with Winter and always got down on his knees to explain things to her.
Tammy Esparza, at the time of trial, had been an employee for Appellant for two years. Esparza testified that she saw both Winter and Appellant at work everyday. Her testimony supported that of Heyworth and Knorpp, describing Winter as well dressed, always with him and prepared with a good lunch. She also recalled that Winter was involved in gymnastics and ballet. Esparza described Appellant as doing everything for Winter. All of these witnesses, when questioned, testified to never having seen Appellant drink or have alcohol on his breath.
Reverend Wiley Hearn, Senior Pastor in United Methodist Church in Amarillo, recalled that Appellant and Winter began attending his church in November, 1996, and that they were in attendance a predominant amount of the time. He testified that Winter participated in the children's Sunday school and always appeared properly dressed and clean.
Richard Lyle Long, Appellant's father, attested to the regular Friday night dinners *780 out in Amarillo with Winter and Appellant where they usually ate oriental food, and Winter spends the night. Long testified that Appellant was very close to his family and that he believed Appellant did a really good job with Winter and treated her very well. Long opined that Appellant puts Winter before work and could make more money if he did not attend to her as much. Long described Winter as very affectionate with Appellant and the family. He also explained that he never knew of Winter being left alone at the dry cleaners.
Julie Pine, Appellant's sister who lives in Amarillo, testified that they are a close family; she saw Winter often. She noted that Winter had to learn to be nice to her child, Edmond. Pine testified that Appellant was never aggressive and that she had never seen Appellant intoxicated or drink alcohol in Winter's presence. Pine stated that she thought Appellant was wonderful with Winter. Pine explained that Appellant takes raising Winter as a priority in his life. She noted that she has no reservations in letting Appellant take care of her young son, Edmond. Pine noted that she understood that Winter was fearful of going with Appellant when he tried to visit her between July and August, 1997, and that she believed Winter behaved this way because Winter was told by her mother that he would steal her away. Pine testified that she had never seen Appellant intoxicated, drink alcohol or act aggressively to or in front of Winter.

3. Appellee

a) Appellee's Business

The record indicates that Appellee has run several bars in the Lafayette area, including The Shop, The Escape and presently, Legends Lounge. Appellee testified that she sold her bar, The Shop, in 1994, which had required her to spend many hours theresometimes until 2:00 a.m. Appellee was partners with Appellant in The Shop for over a year. Appellee admitted that at both The Shop and The Escape, which she opened on August 22, 1994, sex toys and lingerie shows were used to attract customers. When she first opened The Escape, Appellant explained that she had to stay late, but once it was established, she was home by noon every day for the last year and would pick Winter up at school three or four times a week. Appellant explained that the only time Winter went into any of her bars was on the weekends, when they were closed, and Appellant went to pick up money from a safe. During those times, she would let Winter roll balls on the pool table. Appellee testified that she never took the sex toys or paraphernalia from the bar home. She admitted that some were kept locked up in her office or behind the bar during lingerie shows. She stated that Appellant encouraged the lingerie shows that occurred at The Shop and that he had built the pool for the wrestling events. Testimony indicates that when Appellee ran The Escape, she often worked until 8:00 p.m. or later and had babysitters to care for Winter. When The Escape opened in 1994, Appellee explained that she tried to open it as a bar and grill, but the customers were not receptive because they were accustomed to the entertainment at The Shop. So, they started lingerie shows from 12:00 p.m. until 2:00 a.m., wherein the models were required to wear non-revealing undergarments. Appellee explained that she reintroduced her trick of swallowing a sex toy and had a blow up doll and rubber nipples at the bar to start up conversations. The Escape closed on June 27, 1997, and Appellee opened Legends, a bar and grill, on August 1, 1997. Appellee testified that she now comes home between 6:00 p.m. and 6:30 p.m. and that there are no costumes or sex toys at Legends.

b) Winter's Life with Appellee

Appellee's testimony indicates that the last time Winter came back to her, she was very aggressive and tried to hurt her stepsister, Alexandra. Appellee explained that this was new and unusual behavior for Winter and that she behaved this way *781 when she was picked up on July 9, 1997, after coming back from an extended stay with Appellant. Appellee noted that it took Winter about six weeks to get over this aggressive behavior. In response to Appellant's allegations, Appellee testified that Winter has never been sent to school in a cab alone. She explained that Winter has attended Fisher's Early Childhood Development Center in Lafayette since May, 1996. Appellee listed several babysitters who would pick her up from daycare, take Winter home, cook, feed her, help with homework, and bathe Winter if Appellee was not home yet. Appellee explained that her fiancé, Tommy Lasseigne, helped Appellee get Winter to school in the mornings; Lasseigne and Appellee had, at the time of trial, been living together since February, 1997. Appellee testified that over ten different babysitters cared for Winter from 1994 up to the date of trial, many of whom she could not recall.
However, in July, 1997, Appellee testified that she was not working and did not require a babysitter for Winter; she took her to school and picked her up until August 18th, when she hired a babysitter, Leah, to take care of Winter after school from 4:00 p.m. until 8:00 p.m., cooking, bathing the children and helping with homework. She testified that Legends presently requires more of her time because it had just opened.
Appellee explained that when she and Winter are together, they go shopping, see movies, read and color. With her, Winter takes computer classes at the Fisher's Early Childhood Development Center. She explains that she is very affectionate and loving with Winter, she speaks to her in soft tones and does not curse around her. She explained that if Winter was allowed to live with her during the school year, she has recently hired a night manager, so she would be able to leave anytime and spend more time with Winter.

c) Appellee's History with Appellant

Recounting a history of violent behavior, Appellee testified that in April, 1993, Appellant had threatened her and attacked her at The Shop, throwing her against a wall, putting his hands around her neck and bending her backwards on the railing. Appellant denied doing any of this. Appellee testified that he threatened to kill her in telephone calls; she testified that on Halloween, 1993, he again grabbed her by the neck and threw her into a horse trailer. Appellant denied this, explaining that she tried to leave in one of his trucks and that he only took the keys away from her. On November 13, 1993, Appellee testified that Appellant tore down chandeliers (to which he admitted), threw chairs around and broke bar stools and bottles at The Shop in Rayne, Louisiana; he threw a glass at her arm and hit her. Appellant denied hurting Appellee. He stated that there was a lot of pushing and shoving and that he made three circles around the bar with Jeff Bibaeff; Appellant admitted throwing a glass and breaking three whiskey bottles with it. Appellee testified that he totally destroyed the business and that she never re-opened it. Appellee claimed that on April 2, 1994, while Appellant was drunk, he beat up her former husband, twisted her wrist and shoved her around in her office. Appellant denies this; he characterized it as wrestling with her ex-husband. She testified that on April 13, 1994, Appellant broke into her home around 2:00 a.m., attacked her, shoved her neck, ground his fists into her jaw, and threw a phone at her. David Romaine, a Lieutenant with the Lafayette Sheriff's office, testified that he responded to a 911 call on April 13, 1994, from Appellee's home where she complained that Appellant battered her. In his report, he noted bruising on her leg, arm and jaw, which Appellee alleged Appellant caused. He recalled a telephone being pulled out of a wall. Officer Romaine testified that between 1993 and 1994 Appellant and Appellee were "regular customers" at the Sheriff's department, with allegations going back and forth between the two. Appellee testified *782 that the following day, she called the Faith House, and she went there after making arrangements for Alexandra to stay behind so she would not miss school. Appellee took Winter with her to the Faith House where they stayed for two weeks.
Appellant presented a different story. He explained that on April 13, 1994, he put his right hand on her chest at arm's distance so she could not hit him. He also testified that she told him that he could come in since the door was unlocked. Upon cross examination, Appellee admitted that she had consumed nine shots of alcohol between 1:00 p.m. and 3:00 p.m. the afternoon before Appellant broke into her home; she had blacked out around 4:00p.m. Appellee claimed that she arrived at her home around 8:00 p.m. that night and that Winter, then eighteen months old, was in bed. Appellant, on the other hand, explained that on the night of April 13, 1994, Winter had been sick and he was worried about her. Appellee stated that he tried to call and no one would answer the phone. He knew that Appellee was drunk from earlier that day. He knocked on the door three or four times and a low voice told him to come in. He opened the door slightly and asked her if she had a gun, and she said no. Appellant testified that he went in and checked on Winter, who was sleeping and appeared fine. He then went to Appellee's room, sat on a corner of her bed, and began a conversation with Appellee, which lasted about a thirty minutes about how she had to quit and that the next morning they were to meet at 10:00 a.m. to go to New Orleans for DNA testing.
After the April 13, 1994, episode, Appellee testified that she filed for and received a TRO against Appellant. Nevertheless, on the night of May 1, 1994, she stated that Appellant called her home, after the TRO was in place. She claims Appellant slashed her fiancé's tires and put sugar in his gas tank. The record indicates the on May 9, 1994, a hearing was held and a judgment was rendered on Dec. 6, 1994, enjoining both Appellee and Appellant from abusing or harassing each other. That judgment was nullified, according to Appellee, at the September, 1995 agreement. Appellee testified that since the restraining order of 1994, Appellant has had no physical contact with Appellee. Appellee stated that Appellant sued for custody in July, 1994, whereupon he received supervised visitation, every other weekend, for which she paid, until the September, 1995 stipulation. She testified that she was afraid that he would take Winter out of the country, as he had threatened. She admitted, however, that Appellant has not been abusive since May of 1994, since the TRO. Appellee further explained that she never witnessed Appellant exhibit any violence toward Winter, and she had no evidence of the same.

d) Appellee's Version of Custody History

Appellee testified that Appellant is always filthy, sleeps, drinks and eats with tobacco in his mouth and that when he brings Winter back, she is dirty, too. Appellee testified that she saw his apartment once when she went to pick up Winter and that it was filthy, nasty and smelly.
During her first non-custodial period, Appellee testified that she called often; she was allowed to speak with Winter for the first two months only. She explained that she did not pick up Winter for her first six month custodial period on May 1, 1996, as planned because her fiancé was offshore and she was afraid to go alone to get Winter. She picked up Winter when he came back on May 15, 1996. She testified that during her second non-custodial period, November, 1996, through July, 1997, she was able to talk to Winter only four times. She stated that Appellant cursed at her during every phone call she made. She stated that she allowed phone calls from Winter to her father when Winter was in her custody. She testified that during her latest custodial period, Winter did not want to call her father, but she did *783 call her grandmother. Appellee explained that in a videotape taken of Winter, before an exchange of custody, Appellee was purposely not crying or being emotional to make it easier for Winter.
She testified that she tried to make things easier for Winter. When Appellant took Winter, Appellee let him take Winter's bed and some of her things to ease the transition. She testified that he refused to return any of these things when he returned Winter. She noted that she gave Appellant a book called "Discipline Without Shouting or Spanking," to help him, along with a copy of Winter's schedule and the foods she liked. Appellee recalled that Appellant did not give her his address until the second custodial period, and during her second period, she was allowed to see Winter only once, between Christmas and her birthday. Appellee's custodial period ended November 1, 1996, and on that day, she noticed that Winter had a cold. Appellee saw Winter during her one visit, on November 27, 1996, and Winter still was sick. Before Appellee returned Winter to Appellant, she brought Winter to see a doctor. Winter was prescribed Amoxillin to be taken for ten days. Appellee had to return Winter before this time period was over and she testified, and Appellant admitted, that he did not finish giving Winter the medication.
At trial, Appellee discussed a trip she made to Amarillo to visit Winter. Appellee's fiancé went with her, and they rented two motel rooms, staying three days. She admitted that Appellant asked that she and her fiancé not sleep in the same bed and that he offered to let her fiancé stay with him; he also offered to pay for half the cost of a second room in a hotel. Appellee noted that while they complied with this latter request, Appellant never paid what he promised. Appellee recalled that Winter stayed with them in the hotel during those days and that it was forty-five degrees outside. Appellant had sent Winter with only summer clothes to wear to school the next day. Appellee stated that she bought Winter warm clothes at the Disney store. Appellee also recounted that her fiancé was ill and mistakenly unpacked a plastic bag containing the "S & M 101" and voodoo books and returned it instead of Winter's bag of clothes. Appellee testified that Winter never saw these books.
Appellant was due to return Winter in May of 1997, but he failed to do this. A hearing was held in July, 1997, and Appellant was ordered to return Winter to Appellee. In 1997, Appellee was allowed to visit Winter for Thanksgiving and just before Christmas. Appellee explained that when she would return Winter to Appellant, she would say good-bye to Winter in the vehicle before bringing her to the door, because she felt uncomfortable around Appellant. Appellee taped, on March 19, 1997, a conversation with Appellant wherein he cursed and threatened Appellee.
Appellee explained that she was under much stress; she had a miscarriage on May 30, 1997, and The Escape closed in June. Appellee testified that Appellant told her that he was sending people in to spy on her; she sought medical attention at Acadiana Mental Health where she was prescribed Paxil for major depression; at the time she saw Dr. Gaudet, she was taking Xanax and Elavil to prevent migraine headaches.
Corroborating Appellee's testimony, several witnesses testified at trial. Patricia Brandt, a manicurist at Shear's Hair Studio, testified that she has known Appellee for about a year, has been to The Escape, has seen the sex paraphernalia at The Escape and has seen someone there pop another person with a paddle. Brandt testified that she has also been to Legends, which she describes as a lot nicer, cleaner with a very different atmosphere. Brandt stated that her daughter has spent the night at Appellee's home, which is very neat, clean and nice. Her granddaughter, Charity, was friends with Winter and they went to the same day-care. She recalled that Winter was always clean and neat. *784 Brandt testified that Appellee is very attentive to her daughters and is a very good mother. Brandt stated that Appellee makes a point not to drink in front of her children. She testified that between June and August of 1997, Winter was at her house swimming and spoke about going back to Texas with some anxiety.
Tommy Lasseigne, Appellee's fiancé, gave testimony which entirely supported Appellee's version of the facts. He noted that Appellee leaves Legends between 6:00 p.m. and 6:30 p.m., never speaks poorly of Appellant and has only brought Winter to a bar on weekends to get money when the bar was closed. He noted that Appellee is uncomfortable around Appellant, that Appellee is an attentive, loving mother. Lasseigne admitted that he cursed on the phone at Appellant when he interrupted Appellant cursing at Appellee. He testified that he never knew of Appellee sending Winter to day care in a cab alone. Lasseigne described the activities that he participated in with Appellee and her family, including trips to the zoo, parks and theaters. Lasseigne recalled that on Thanksgiving day, 1997, he went with Appellee to pick up Winter, and except for one suit, all of Winter's clothes were short-sleeved; none of the socks she had matched. Lasseigne testified that they bought more appropriate clothes for Winter because it was cold. Lasseigne testified that he has never heard Appellee speak negatively about Appellant in front of the children, and that Appellee, as of last two or three years, drinks very little.
The record indicates that Appellant has a history of convictions involving drinking and driving. Several convictions were listed, and Officer Mike Onezene of the Lafayette City Police Department, Alcohol and Traffic Action Campaign unit, testified at trial that on January 20, 1998, he stopped Appellant for suspected drunk driving. He testified Appellant staggered out of his vehicle, gave him his Texas license and refused a field sobriety test because he did not want to jeopardize his custody battle with his daughter. Consequently, he noted that Appellant will lose his license for six months. The officer testified that when he ran a check on his Louisiana license, he found Appellant had two prior OWI convictions in this state.
Rachel Lucille Richards testified at trial that she at first rented an apartment from Appellant, then dated him and lived with him for a few months. She was living with him when Appellee became pregnant with Winter, and he broke up with her when he found out Appellee was pregnant. Richards admitted that she would never forgive him for that. Richards also worked for Appellee at Legends. Richards described her relationship with Appellant and recalled that while he never hit her, he did hold her around the neck so she would not leave. She testified that on one occasion, because she was drinking, she and Appellant had a fight and when was holding her, they both slipped and fell and her jaw hit a dresser, knocking it out of place. She testified that in 1994, Appellant grabbed her friend and bar owner, Eric Trahan, by the neck until he passed out; she testified that in the past, Appellant has harassed her and that sometime between 1991 and 1992, he once called her sixty-four times in an hour. She recalled that Appellant had been involved in an altercation with a man named George Broussard several times. All of this happened before Winter was born. In 1994, Richards stated that when Appellant discovered Paul Trahan had been drinking, he went to his apartment and threw him around and hit him. On cross examination, Richards remembered that Paul Trahan had stolen Appellant's truck. She testified that in 1996, Appellant let her move into his apartment in Amarillo to help get her to a doctor. At this time Winter was not living with him. She described his apartment as fairly clean, though it smelled like cat litter; Appellant had no cat. She testified that he drank scotch liquor everyday. Richards testified that she found Appellant had scotch hidden at the cleaners and in his *785 van, too. Richards explained that Appellant asked her to spy on Appellee and that she knew of people he had paid to do the same. She testified that she believed Appellant put sugar in Appellee's gas tank, that he wanted to burn down Appellee's bar with Appellee in it and take his daughter overseas. Richards stated that Appellant threatened to her harm her little brother if she testified against him.
Bonita Dupuis has known Appellee for five years. Dupuis stated that she was an employee at The Shop in Lafayette. She worked for Appellant at the time; he would pick her up and take her to work. She also worked at The Escape and at Legends, just to fill in. She is friends with Appellee. Dupuis stated that she was afraid to testify at trial because she feared Appellant. She stated that Appellant encouraged her, and the girls that worked at the bar, to participate in the lingerie shows. She testified that Appellant promoted entertainment at The Shop; he had sex toys, very large ones, and promoted cheerleader kicks. She stated the same items were used at The Escape and were novelty, gag items; she explained that the bar made money by selling booze. Dupuis stated that the books that Appellee had with her in Amarillo were used in the bar to read to customers to entertain them, that she was familiar with Appellee's home and that Appellee had no such books in her very neat house. She describes Appellee as very motherly and affectionate. Dupuis stated she had observed Appellee drink when she was out, but never in front of her children. Dupuis opined that Winter and Alexandra, Appellee's other child, have a very good relationship and treat each other well.
Heather Prudhomme, Appellee's twenty-two year old daughter from Lumberton, Texas, gave testimony at trial indicting that she was raised by her grandmother and that she believed Appellee did the right thing by giving her up. Prudhomme stated that she knows Alexandra and Winter and that Appellee has raised Winter and Alexandra in a more peaceful, more stable and more dependable environment. She expressed that she loves them. Prudhomme described Appellee as a good mom.
A review of the record provides ample evidence upon which fact finders could disagree as to the true nature of the respective atmospheres and methods of parenting provided by each party. There is evidence in the record supporting and refuting the love and affection given to Winter by both parents; there has been no indication that either parent is incapable of providing proper food, clothing, etc. for Winter; Winter has spent nearly equal time with each parent since the 1995 judgment; neither parent put on any evidence indicating how permanent their homes are, though we note that Appellee is living with her fiancé in a home and Appellant lives alone in an apartment; both parties moral fitness has been supported and refuted on the record; both parents appear to be interested in and have provided educational resources for Winter; it is in clear dispute exactly how much either parent encourages Winter to relate with the other parent. The record is replete with extensive information that does nothing more than make certain that there is no clear cut choice in this matter. We find that great deference is appropriately given to a trial judge who is in the best position to weigh the credibility of the witnesses, evidence and testimony. We find no abuse of discretion of the part of the lower court, and we find that the trial court reasonably found in favor of Appellee in granting her domiciliary custody.

C. ASSIGNMENT OF ERROR NO. 3

Appellant asserts that the lower court erred when it rejected the opinions of all three psychologists involved in the case. Appellant acknowledges that while a trial court is not obliged to accept the opinions of experts, in this matter, based on the facts of the case, it was error to reach a conclusion contrary to the experts. "The trial court can accept or reject the *786 testimony of experts and should evaluate such testimony in the same manner as lay testimony. The trial court is not bound by expert testimony and is vested with broad discretion to determine its effect and weight." Phillip v. University Med. Ctr., 97-302, pp. 7-8 (La.App. 3 Cir. 4/22/98); 714 So.2d 742, 747, writ denied, 98-2143 (La.11/13/98); 730 So.2d 938. Given this broad discretion, and the extensive amount of evidence and testimony presented by the parties at trial in addition to the expert testimony, we find no error on the part of the trial judge's rule, despite the expert testimony.

D. ASSIGNMENT OF ERROR NO. 4.

Appellant asserts that the trial judge erred in awarding him inadequate time with the minor child. While certainly it is more difficult to arrange frequent custodial periods given the distance between Amarillo, Texas and Lafayette, Louisiana, and a school schedule that Winter will now necessarily follow, this reviewing court declines to alter the trial judge's arrangement in light of the many factors, other than distance between the respective residences of the parents, that must be considered when making custodial arrangements. Where we have found no abuse of discretion in the district court's judgment, as discussed above, we affirm his rule granting Appellee domiciliary custody.
We note that Appellant requests amendments to the custodial implementation plan in the event Appellee remains the domiciliary parent. Appellant seeks several modifications in the details of the custody arrangement. A review of the arrangements reveal no abuse of the lower court's discretion and we decline to make any modifications at this time.

E. ASSIGNMENT OF ERROR NO. 5.

Appellant asserts as error the district judge's declaring facts outside of the record and in permitting evidence to support those facts. Appellant argues that his case was prejudiced by the erroneous admission of evidence when the trial court allowed Officer Mike Onezene to testify concerning a suspected DWI arrest made on Appellant on January 20, 1998. Appellant argues that opposing counsel had no knowledge of the arrest until the district judge disclosed in the proceedings of January 23, 1998, that he had information of Appellant's recent arrest. As a result of the judge's statement, opposing counsel procured the arresting officer to give testimony at trial.
That Appellant was arrested for DWI was published in the newspaper on day the trial judge mentioned it to the parties. In discussing it with the attorneys, the trial judge merely explained that the published information had been brought to his attention. As Appellant asserts, this information was new to both counselors and as such, along with Appellant's opportunity to cross examine the officer, both parties had equal access to the evidence. Appellant argues that the information is not relevant. Given the history of convictions that Appellant has with drinking and driving and the proximity of the arrest to trial, we find that such evidence is very much relevant to the La.Civ. Code art. 134(6) consideration of moral fitness of the parties. Additionally, we emphasize the appropriateness of the lower court's forthright method of alerting the attorneys of information that had been brought to the attention, not only to the judge, but to public at large through publication.

CONCLUSION
The record as a whole reveals the difficult determinations that must be made when effecting child custodial arrangements. With ample evidence and information supplied to the court by each party, we find upon review that the lower court properly exercised its discretion in granting joint custody to the parties with Appellee assigned as domiciliary parent.

*787 DECREE

For the reasons expressed herein, we affirm the trial court's judgment implementing a joint custody arrangement between the parents of Winter Jade Long, with Appellee, Catherine West Dossett, having domiciliary custodial status over Winter. Costs to be paid by Appellant.
AFFIRMED.