JjDREW, J.
The mother (AEB) appeals the trial court’s judgment which modified a considered joint custody decree and changed the primary domiciliary parent of the now six-year-old son (JE) from the mother to the father (JBE). In addition to complaining that the trial court erred in denying her motion for involuntary dismissal, the mother contends that the trial court improperly applied the law and rendered a judgment which is unsupported by the evidence. The judgment is reversed and the matter is remanded with instructions for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Married in August 1986, AEB and JBE had one child, JE, born 9/17/92. The parties separated in October 1993, and both parties sought custody of their son. Following a hearing, the trial court concluded that joint custody was in JE’s best interests. The April 22, 1994 judgment, a considered decree, made AEB the primary domiciliary parent subject to the father’s liberal visitation set out in a joint custody and visitation plan. At that time, JE resided with his mother and two half-brothers from AEB’s previous marriage. AEB’s two older sons were GP, 15 in the fall of 1996 and MP, 14 in the fall of 1996.
In the summer of 1996, AEB married DB, who moved into the her home along with his two children, a son BB (approximately four to five years older than JE) and a daughter, HB (approximately 6 years old). In September 1996, JE reported to his father and his paternal grandmother that he had been subjected to oral sexual contact by BB, his step-brother. In response, the father immediately reported the matter to the mother and to law enforcement personnel. JBE also took JE to physicians and mental health professionals.
Eight months later on May 20, 1997, JBE filed a petition to modify custody of the four-year-old JE so that JBE would be primary domiciliary parent of his son. 12JBE’s initial petition was limited to allegations that substantial changes in JE’s circumstances warranted the custody change and that continuation of the mother as domiciliary parent was so deleterious that modification was essential. Answering, AEB denied the allegations of the petition and filed an exception of no cause of action, interrogatories and notices of depositions.
Another seven months thereafter on February 28, 1998, JBE filed an amended petition. He asserted that significant discovery including depositions of the parties and Dr. Webb Sentell, a psychologist, had occurred. In the amended petition, JBE first alleged that his four-year-old son, JE, had been subjected to sexual molestation by BB, his step-brother who was approxi *191 mately nine years old at the time of the molestations. Specifically, JBE asserted that in August and/or September 1996 and November and/or December 1996, BB placed JE’s penis in his mouth. Because the children resided in the same household, JBE contended that JE was at risk for further inappropriate sexual behavior. JBE urged these acts were a great change in circumstance that made modification of the custody decree essential. JBE also alleged that he had taken JE to two physicians, a social worker, and a clinical psychologist, all of whom would testify that JE’s reports of sexual molestation were credible. JBE also requested that AEB be held in contempt for violations of the visitation order.
AEB made a general denial to JBE’s amended petition. In April 1998, the father’s previous attorney withdrew and his present counsel enrolled. Attorneys for both parties jointly obtained a September 8, 1998 trial date. In August 1998, the mother sought an increase in child support and modification of custody and visitation. On that same day, the father sought a continuance because the mother’s attorney had not responded to his requests for discovery. On September 4, the trial 13court continued the trial without fixing another trial date. By joint motion in November, the parties’ attorneys obtained a January 22,1999 trial date.
During the trial, the parties stipulated that the case was investigated by the De-Soto Parish Child Protection Agency in accordance with their policies and procedures. The investigation did not reveal any culpability on the part of the parents. The agency had knowledge that there had been a prior contested case involving the child.

REASONS FOR JUDGMENT

Following the two-day hearing on January 22 and 25, 1999, the trial court issued a written ruling and made the following factual findings (in which initials have been substituted for names):
At the time of the original considered decree, [AEB] had not re-married and [JE] was to live with his mother and two (2) step-brothers, [AEB]’s sons by a pri- or marriage. [AEB] subsequently married [DB] in the fall of 1996 and he, along with his two children BB and HB, began living with [AEB], [JE] and his two step-brothers. At some point in time in December of 1996 [JE] began to be subjected to inappropriate oral sexual contact by BB. [JE] reported this to his father, [JBE] and his grandmother, [ME]. [JBE] confronted [AEB] with these allegations and this Court concludes that [AEB] failed to take sufficient steps to protect [JE],
[JE] was examined and evaluated by Dr. Webb Sentell and Dr. Bruce McCormick. [JE] has behaved in an inappropriate “acting out” fashion by attempting to bite others on the buttocks and placing his face in others’ crotches.
The evidence indicated that [AEB] and her present husband have taken some steps to minimize the opportunity for unsupervised contact between BB and [JE], including the placing of a hidden audio monitoring device in [JE] ’s bedroom. Yet, [AEB] and other family members and friends deny that any inappropriate conduct has occurred with [JE]. In their denial this Court believes further harm has been done to [JE].
Based upon the mother’s remarriage, the introduction of BB into JE’s life and the “proven incidences of inappropriate sexual contact by BB upon [JE],” the trial court concluded that the father met the heavy burden of Bergeron v. Bergeron, |4 492 So.2d 1193 (La.1986) by showing a change of circumstances that materially affected JE’s welfare. Therefore, the trial court determined it had the authority to consider a significant change in the custody order.
The trial court evaluated the competing parents’ circumstances. Single and living alone, the father’s life revolved around JE *192 and his work. The paternal grandparents were found to be loving, concerned and active grandparents. The trial court acknowledged that the mother clearly loved JE and was not the direct cause of the immediate harm to JE. In all other respects, the trial court concluded the home of AEB and her new husband was a stable, comfortable environment for a child. The court found that there was insufficient proof that she had encouraged JE to deny the allegations. Because of the mother’s denials of the harmful situation and her plan to minimize unsupervised contact between JE and BB, the court concluded that JE was having to suffer the situation alone. Although the experts could not quantify the danger, the court opined that the risk of harm was too great to ignore.
While maintaining joint custody, the trial court found JE’s interests would be better served by placing him in the primary and domiciliary care of his father. Visitation consistent with that previously granted to the father was awarded to the mother subject to a number of restrictions to insure JE was never alone with BB at any time.

LAW

In Bergeron, supra, the supreme court stated that although the trial court has continuing power to modify a child custody order, there must be a showing of a changed circumstance which materially affects the child before the trial court may make a significant change in the custody order. The goal of that rule is to end custody litigation and to avoid changing the child’s living arrangements except for | ¿imperative reasons. The party seeking the change of custody has previously had a full and fair opportunity to litigate the custody issue. This rule protects the other parent and the child from the burden and expense of multiple lawsuits, conserves judicial resources and fosters reliance on judicial decisions. While noting that the paramount consideration • in any child custody dispute is the best interest of the child, the court stressed that other relevant factors in change of custody cases include the harm which may result from disrupting the child’s living situation, the injury from unjustified litigation and the damage of continued parental conflict. Bergeron, supra.
The Bergeron court emphasized in addition to the change of circumstance rule, the heavy burden of proof also applied to change of custody.
When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.
492 So.2d at 1200.
When no considered decree has been rendered, the Bergeron burden of proof does not apply. The party seeking to modify custody must show only that a material change in circumstances occurred since the original decree and that the proposed change is in the child’s best interest. Long v. Long, 28,763 (La.App.2d Cir.12/11/96), 684 So.2d 1099, writ denied, 97-0096 (La.3/7/97), 690 So.2d 20.
In Bergeron, supra, the court also explained that in addition to the change of circumstance and the heavy burden rules, the appellate standard of review is applicable to any petition to modify either joint or sole custody in a considered decree. The appellate court may not set aside a trial court’s findings of fact unless those findings are clearly wrong or manifestly erroneous. The test is essentially whether the trial court’s findings are reasonable. Even if the appellate court feels |r,that its own evaluations are more reasonable than the fact finder’s, the latter’s reasonable determinations, inferences of fact and credibility judgments should not be disturbed. When *193 there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
The fact finder’s great discretion extends to its assessment of expert testimony. In addition to the witness’s professional qualification and experience, the facts on which expert testimony is based determine the weight given by the court to expert testimony. For an expert opinion to be valid and to be given much weight, the facts on which it is based must be substantiated by the record; absent substantiation in the record, the trial court may reject it. Gould v. Gould, 28,996 (La.App.2d Cir.1/24/97), 687 So.2d 685.
After 1993 legislative amendment and reenactment effective January 1, 1994, La. C.C. art. 131 states:
In a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child.
The comments establish that the judicial requirements of Bergeron, supra, govern requests for custody changes after considered decrees, due to the special considerations present in change of custody cases. Gould, supra.
In civil matters, the plaintiff generally bears the burden of proving his claim by a preponderance of the evidence. Proof by direct or circumstantial evidence is sufficient to constitute a preponderance of the evidence when all the evidence shows that the fact sought to be proved is more probable than not. If the party does not satisfy his burden by a preponderance of the evidence, his case fails to outweigh his opponents and he loses. Silva v. Calk, 30,085 (La.App.2d Cir.12/10/97), 708 So.2d 418. A burden of proof requiring clear and convincing evidence is more than a “preponderance of the evidence” and less than “beyond a reasonable doubt.” To establish a fact by clear and convincing evidence, the | existence of the disputed fact must be highly probable; i.e., much more probable than its non-existence, Succession of Bilyeu, 28,701 (La.App.2d Cir.9/25/96), 681 So.2d 56, writ denied, 96-2868 (La.1/24/97), 686 So.2d 862.

TESTIMONY

Father’s Testimony:

In support of his assertion that JE had been subjected to inappropriate sexual contact from BB, his step-brother, JBE testified that in September 1996, JE made sucking motions with his mouth and stated BB had done that to his tee-tee. JBE called the sheriffs office which referred the matter to Child Protection Agency. Father and child went for an interview the next day. The following day, JBE was informed JE was being returned to AEB who refused JBE’s request that he be permitted to take JE to a doctor immediately.
A week and a half later when he next had visitation, he took JE to a doctor who found nothing wrong. After the second report in December, JBE took JE back to the doctor and to a urologist because an abrasion was found on his penis. About the time of both incidents, JE complained about his penis burning and needing to urinate every few minutes. According to his father, JE frequently walked around holding his genitals. After a second report, the father again contacted child protection. The father assumed the agency did nothing, since its personnel would give him no information.
After getting the first report, JBE took JE to Shelia Baxter, a counselor, from the first part of October 1996, until March or April of the next year, at the rate of once a week or once every two weeks. Baxter referred JE to psychologist, Dr. Sentell. On cross-examination, JBE stated he took JE to Sentell three or four times.
1 ^Immediately after they took the mother’s deposition, JBE stated JE became evasive and called his father a liar. The father opined that JE had been coached not to talk. In addition to the September *194 and December 1996 accounts, JBE stated his son also made reports of sexual misconduct in February and September or October of 1997.
Explaining why a delay from September 1996 to January 1999 occurred between the incident and the trial, JBE stated his initial lawyer did not handle those type of cases and his second lawyer proved unreliable. JBE hired his present lawyer in 1998.

Paternal Grandmother’s Testimony:

JBE’s mother and JE’s paternal grandmother recounted that they learned from JE in September 1996, the weekend of the child’s fourth birthday, that BB had performed oral sex on JE in the tub. Around Christmas, and in January or February of the next year, there were additional reports from JE, including JE’s statement that BB had requested JE perform oral sex on him.
She stated that JE in the past had loved baths but suddenly did not want to bathe. Instead of laying with his head in her lap, he began trying to put his face into her crotch and to bite or kiss her buttocks. On one occasion when JE had skinned his shin, he lay on the sofa with his feet in her lap. After she kissed his shin to make it “all be well,” he spread his legs and patted his genitals which she apparently interpreted as a request to kiss his genitals. The paternal grandmother interpreted a drawing by JE around December 1997 as having a penis. When she told JE the drawing was not nice, the child drew her another one “just plain.”

Dr. Webb Sentell, Psychologist:

Accepted as an expert in clinical psychology, Dr. Sentell saw four-year-old JE on a referral from Sheila Baxter, a therapist at the YMCA Rape and Family 19Crisis Clinic, for his evaluation for psychological damage. Over the mother’s hearsay objections, the trial court permitted Dr. Sentell to testify that Baxter told him she believed the child’s allegations of sexual molestation by his step-brother were legitimate.
During their first session on May 14, 1997, JE was very open in reporting that BB had sucked his tee-tee, although JE did not supply as much detail as the doctor would have liked. However, JE’s report was consistent with other information Dr. Sentell had received about the matter. When asked to draw, JE’s first picture appeared very phallic and looked to the psychologist like an “erect penis with, you know, the parts.” JE told Dr. Sentell the drawing was a fish at Wal-Mart. Very careful not to introduce or suggest information, Dr. Sentell stated JE identified another drawing without a penis as BB and reported other non-sexual altercations with BB. The psychologist concluded that the information from JE was credible as was the information on forms filed out by JBE and the paternal grandparents because their responses were not exaggerated. He acknowledged that JE had seen Baxter a number of times and material tends to deteriorate the more times a young child is interviewed.
Shortly after Dr. Sentell’s October 1997 deposition, he had a second session with JE, on October 29, at which the child was very reluctant to go over the sexual incident. Dr. Sentell stated he had to corner JE about what happened and then JE would tell the same story but was very insistent at immediately changing the subject. Dr. Sentell opined that the child had been coached to refuse to talk about sexual molestation. Before the third interview on July 24, 1998, the father reported to Dr. Sentell that JE had stated “I’m not taking baths with BB anymore and I’m not going to talk.” When Dr. Sentell confronted JE about past statements about BB’s oral sexual contact, the child responded, “Yea, but not anymore. We |indon’t take baths anymore. We don’t take showers.” JE denied to the psychologist that his mother or anyone instructed him to say that.
Dr. Sentell acknowledged that “playing doctor” was common among children. If *195 difference in ages (five years or more) and sizes of children made coercion possible, the experimentation was abusive. What allegedly occurred between JE and his step-brother was abnormal rather then normal “playing doctor” due to their differences in ages and sizes. However, BB’s age is only approximated in the record which contains no information about the respective sizes of the children.
Dr. Sentell stated that at the time he wrote a report (not placed into evidence), the child was exhibiting signs of sexual abuse; i.e., asking his grandmother to suck his tee-tee, asking his aunt to hand me your tit (assertion not found elsewhere in the record), and drawing a penis on Santa Claus. However, JE exhibited no depression and anxiety, other signs of sexual abuse. Assuming JE’s reports were true, Dr. Sentell stated he would expect it to possibly cause trouble later in life if not resolved now.
If a parent denied allegations of sexual abuse occurred and did not take steps to protect the child, Dr. Sentell’s opinion was that denial caused tremendous potential problems because it permitted continuation of the abuse. An appropriate parental response would be to consult a therapist and form a safety plan no matter how innocent or severe the incident. The safety plan would include persons watching the alleged perpetrator and the alleged victim 24 hours a day and preventing the two from sleeping together, taking baths together or being alone together. The next portion of the safety plan would be individual and family therapy.
| ^Because the child subsequent to the initial meeting denied the event and would not discuss it, Dr. Sentell concluded JE was more at risk because children should be encouraged to speak freely about uncomfortable sexual situations. Dr. Sen-tell’s opinion was that the incident with BB clearly occurred several times, since the child told his grandmother that BB sucked his tee-tee all the time (not contained in grandmother’s testimony). Dr. Sentell also noted that the child reported a lot of physical aggression and maltreatment with which the adults apparently did not deal.
On cross-examination, Dr. Sentell acknowledged that the child exhibited no psychopathology on any of his visits and that the only problem exhibited was sexual acting-out behavior. JE had no depression, anxiety or post-traumatic stress disorder. Responding that the child may have no problem from the alleged incidents for the rest of his life, Dr. Sentell opined there was the potential for tremendous problems, but that could not be predicted. At the time of trial, the child had no discernable mental condition as a result of the allegations.

Dr. Bruce McCormick, Psychologist:

At Dr. Sentell’s request, Dr. McCormick, an expert in child psychology, saw the five-year-old child on August 6, 1998, for a second opinion about whether the child had been sexually victimized. Dr. McCormick used very leading questions and asked for specifics the child did not generate. Aside from a statement that BB touched his privates in the bathtub, JE gave no information about sexual contact. While he could not rule out that the child had been subjected to inappropriate sexual contact, the doctor did not have the data to say definitely or with a great deal of certainty that it occurred. From the child’s presentation which did not appear rehearsed, Dr. McCormick concluded it was within the realm of possibility, but nothing beyond, that sexual contact occurred. He acknowledged l^that his use of leading questions meant that the conclusión he reached might be flawed. Characterizing the factors as not clear and convincing, Dr. McCormick explained that if a rating of 1% meant no inappropriate sexual activity and 100% meant certainty that it occurred, then his opinion was 75% that something improper occurred. None of the child’s responses were very convincing that the child was sexually molested. In addition to being unable to pinpoint when an incident occurred, Dr. McCormick stated he *196 was unable to determine if an incident took place. Dr. McCormick conceded he had no conclusive opinion on whether oral sex was performed on the child.

Mother’s Testimony:

At the time DB and his two children moved into AEB’s three bedroom home, AEB and her husband occupied one bedroom while half-brothers JE and GP (both AEB’s children) slept in the room next to hers while step-brothers BB (his) and MP (hers) slept in the third. AEB converted a large foyer into a bedroom for DB’s six-year-old daughter. In the fall of 1996, AEB worked from 8:00 a.m. until 5:00 p.m., and the children stayed in day care after school until she left work. Occasionally a babysitter kept the children at home.
AEB acknowledged that prior to September 1996, BB and JE had bathed together but that JE had never complained about BB hurting him. AEB disagreed with Dr. Sentell’s conclusion that JE had been sexually abused because the children were never alone long enough for abuse to occur. Notwithstanding that, AEB stated that she took BB and HB (her step-children) to see the counselor after child protection personnel called and stated there had been a report of another incident. She admitted answering at her July 1997 deposition that she took the children to make sure her family was okay. On cross examination, she explained that although she did not believe the sexual abuse allegations, she still took the [^children to the counselor. Her reason was that she loved JE and would do everything possible to make certain he was cared for. While she did not believe it, she did not know whether or not the sexual abuse occurred. Rather than stick her head in the sand, she chose to do something to make certain everything was okay by having a professional evaluate and give her an opinion. She took the children to reassure herself.
AEB discussed the sleeping arrangements with Baxter who told AEB to keep them as they were. AEB acknowledged that Baxter told AEB at the beginning that Baxter was convinced that JE’s reports were true. She denied that Baxter told her she wanted to see her and BB, the step-brother, extensively because of the allegations. While she took the stepdaughter once, she stated she took BB approximately every two weeks from December 1996 until summer 1997. AEB admitted that Baxter recommended she take BB to Dr. Sentell, which she and her attorney chose not to pursue.
While JE did report to his mother that his penis tingled on occasions, AEB testified she corrected that problem by eliminating JE’s taking bubble baths. At the time of trial AEB stated that her present husband, DB, was at home with the children every day after school. AEB stated that after the first report, the child protection agency investigated, inspected and interviewed the children along with herself and her husband. Nothing further took place. At that time, she stopped JE and BB bathing together and sleeping in the same room.
AEB described the additions to their home since these allegations arose. Since December 1997, JE and his half-bother, GP, aged 17, shared the former master bedroom and had a half bath to themselves. The older boy was very helpful with JE and they were very close. During renovations, AEB placed a hidden monitor in JE and GP’s room so she could hear everything going on. Since its 114installation, she had heard nothing out of the ordinary take place. AEB’s stepdaughter has a bedroom and BB also has a bedroom which he shared with MP who has since moved. Although she did not accept the allegations that JE had been sexually abused, AEB testified that she took the allegations of inappropriate behavior seriously and took steps to insure that did not occur. In addition to the monitoring system, she had her 17-year-old son with JE and did not permit BB and JE to stay overnight together at other homes. AEB stated that JE had lived in that home since his birth and that he *197 attended the same school as the rest of the family except for MP who lived elsewhere with his father. For a time she owned a day care, so she was with all the children at all times when they were not in school. When her husband was injured, she sold the daycare and went back to work at the lumber yard. However, she adjusted her hours so she could be home at 3:30 every day with the children. She testified she planned to be at home all summer with the children.

AEB’s Present Husband:

DB testified that once the allegations about BB were brought to their attention in September 1996, BB and JE never bathed together again. At the January trial, DB testified he was on disability and primarily stayed home with the children after three. His testimony was that the children were generally with him and the mother when they were not in school. He was satisfied the allegations were not true after four or five professionals had looked into the situation. However, he stated he and AEB had done everything in their power to make certain it did not occur or have any chance to return.
Other witnesses for the mother testified AEB was a good loving mother who had a good relationship with JE. JE’s father stipulated that AEB and JE |1Battended church when he was with his mother and that they were church-going, God-fearing people.

DISCUSSION

A review of this record reveals that the trial court erred in finding the father’s evidence met the Bergeron test. That conclusion pretermits a discussion of the mother’s specific complaints on appeal. The record reveals that the trial court was faced, in addition to the very troubling allegations of sexual misconduct, with parties whose relationship is fraught with mistrust and animosity. It is also evident that both parents genuinely love this child and are sincere in their beliefs that this sexually inappropriate behavior did or did not occur.
The father’s evidence of the inappropriate contact between the children is limited to the testimony of himself, the paternal grandmother and Dr. Sentell who acknowledged basing his conclusions in part on information supplied to him by them and the counselor, Shelia Baxter. Although Baxter saw all of the persons involved in this family crisis first and most extensively, neither side called her to testify. JBE referred in his pleadings and during his examination of witnesses to depositions and responses to interrogatories, yet that discovery material was not placed into the record. Further, the record contains only approximate age information on BB and no information about the relative sizes of the two boys involved.
The mother vigorously complains that the trial court erred in permitting hearsay testimony about the statements and opinions of Shelia Baxter. La. C.E. art. 703 provides that facts upon which an expert bases an opinion may be made known to him before the hearing. If of a type reasonably relied upon by an expert in forming opinions, the facts or data need not be admissible into evidence. In Judicial Commitment of J.M., 560 So.2d 100 (La.App. 3rd Cir.1990), the court [ ^observed that a psychiatrist’s testimony about histories supplied by family members was hearsay, but nevertheless admissible, since family observations are reasonably relied upon by psychiatrists in diagnosing and treating patients. Likewise, when a very young child alleges sexual misconduct, mental health professionals reasonably rely on histories supplied by family members and other referring counselors.
Based upon the accounts of the child’s sexual “acting out” behavior and the child’s accounts to his father, his paternal grandmother and Dr. Sentell that BB subjected him to oral sexual contact, the trial court could reasonably have interpreted the evidence in the record that it is more proba *198 ble than not that some type of inappropriate sexual contact occurred between these two children and that the father proved by a preponderance of the evidence that inappropriate sexual activity occurred.
However, that evidence does not rise to the required level of clear and convincing. Inappropriate sexual contact was not shown to be highly probable; i.e., much more probable that it did occur than it did not. The father did not present any medical testimony from the physicians who examined JE and, inexplicably, did not provide testimony from the counselor who saw both children. In addition, JBE did not introduce depositions and responses to discovery. While some weight may be given the experts’ testimony, the conclusions of both Dr. Sentell and Dr. McCormick are seriously weakened by the fact that both candidly admitted to questioning the child with very suggestive and leading questions. And after the first visit Dr. Sentell had to “corner” JE to get him to respond about the allegations at all. Further, some bases for Dr. Sentell’s conclusions are based upon information not supported elsewhere in the record; eg, that he asked his aunt to hand him her tit, that he told his grandmother BB sucked his penis all the time and | wthat BB was much larger. Except for one statement that BB touched his private parts once in the bath tub, Dr. McCormick was unsuccessful in getting the child to discuss the situation. Notwithstanding his testimony that he was “75%” sure something improper occurred, Dr. McCormick was unable to determine when or if such an incident ever occurred.
Most critically, the record is devoid of proof that (1) the continuation of JE living with his mother was so deleterious that changing the custody was justified or (2) clear and convincing evidence showed the harm to be caused by changing the child’s environment was substantially outweighed by its advantages to JE. Dr. Sentell admitted that JE had no discernable mental problems as a result of the inappropriate contact and that he had no depression, anxiety or post-traumatic stress disorder which are symptoms of sexual abuse along with the problematic sexual behavior which he did display. After the initial reports, there is no substantive evidence in the record that repeated episodes occurred. Further, a significant period of time during which JE remained with his mother elapsed from the September 1996 initial report until after the January 1999 trial.
Understandably entirely focused on protecting this very young child, the trial court erred in concluding that the mother’s continued belief that the sexually inappropriate behavior did not occur was the equivalent to her failing to take steps to protect JE from any repeated incidents. Dr. Sentell’s testimony was that a denial of allegations by the caretaker combined with a failure to protect would cause tremendous potential problems for recurrence and feeling of isolation by the victim. The record reveals that the mother immediately took steps to avoid any opportunity for a repeat of inappropriate activity to occur by forbidding any joint bathing or sleeping, by installing monitors, by adding on to the family home, by making certain the two children were never left alone, by adjusting her work hours 11Rto make certain they were properly supervised at all times and by forbidding the two children from spending the night together away from her home. The mother’s actions incorporate the bulk of what Dr. Sentell described as an appropriate parental response of consulting a therapist (she took BB and talked to Baxter herself and knew that JBE was taking JE to therapy) and forming a safety plan including having persons watch the alleged perpetrator and victim 24 hours a day, having her 17-year-old son watch JE and preventing the children from bathing, sleeping or being alone together. She testified of loving JE and wanting to do whatever she could to protect him.
Unfortunately, the parents’ animosity towards one another and their respective families influenced their efforts to protect *199 this much loved child. This is the very scenario which Bergeron, supra, is designed to avoid. In a change of custody action after a considered decree, there is much more involved than determining which of the available custody situations is best. Indeed, in this case, the trial court found both homes (absent these allegations) to be stable comfortable environments. The harm which results from disrupting a child’s established mode of living and the injury resulting from continued litigation and conflict are relevant factors.
The trial court’s conclusion that the mother’s denial that anything improper took place was the equivalent of harming the child was not reasonable in light of the evidence presented. A review of the record shows that JBE did not meet the heavy burden of establishing that leaving JE in his mother’s home where he had lived all his life was so deleterious that modifying the custody decree was necessary. The father also failed to present clear and convincing evidence that the harm caused by changing JE’s custody was substantially outweighed by its advantages to him. The absence of evidence of any continuing misconduct on the |19part of BB or any propensity for further misconduct by BB, now approximately eleven years old, is also very significant.

DECREE

The judgment of the trial court naming the father as primary domiciliary parent is reversed and the child’s primary domiciliary custody is returned forthwith to his mother. The matter is remanded to the trial court for further proceedings which are to include formalization of the protective steps initiated by the mother and any further requirements of the trial court to insure that the children involved are protected from inappropriate contact and from harm created by these allegations and resulting litigation.
REVERSED AND REMANDED.
hPer Curiam.
An assessment of costs for this appeal was omitted from the opinion rendered August 11, 1999. Costs of this appeal are to be paid by the father.