752 So.2d 756 (1999)
AEB
v.
JBE.
No. 99-C-2668.
Supreme Court of Louisiana.
November 30, 1999.
*757 Brian Clayton McRae, Counsel for Applicant.
Francis Marion Gowen, Jr., Shreveport, Counsel for Respondent.
MARCUS, Justice.[*]
In this proceeding to change child custody, we are called upon to determine whether domiciliary custody of the child, JE, should be changed from the mother, AEB, to the father, JBE.

FACTS
The parties were married in August of 1986. One child was born of the marriage, JE, on September 17, 1992. The parties separated in October of 1993, and JE remained in the family home with his mother and two half-brothers from her previous marriage. Both parties sought sole custody of JE. After an evidentiary hearing, the trial judge determined that either parent would be a fit and proper domiciliary parent. He awarded joint custody and designated the mother as domiciliary parent subject to visitation in favor of the father as set forth in a joint custody and visitation implementation plan. At the time the joint custody award was rendered on April 22, 1994, JE was twenty months old.
In the summer of 1996, JE's mother married DB who moved into her home with his two children, a son, BB (about *758 eight years old ), and a daughter, HB (about six years old). According to JE's father, during a visitation with him in September of 1996, JE began to make sucking motions with his mouth and reported to his father and his paternal grandmother that BB "had done that on his tee-tee." JE's father reported the incident to the sheriff and the Child Protection Services for DeSoto Parish. He also took JE to a medical doctor but the doctor could not find anything physically wrong. JE told his father of another incident of oral sexual contact by BB upon him in December. Around the time these incidents occurred, JE also complained to his father that his penis was burning, he would have the urge to urinate frequently and he would walk around holding his genitals. JE's father took him to a urologist because of an abrasion on his penis.
After the first incident, JE's father took him to Shelia Baxter, a counselor for the YMCA Rape and Family Crisis Clinic, and continued to do so every other week until about March or April of 1997. Ms. Baxter then referred JE to a psychologist, Dr. Samuel Webb Sentell, who met with JE on three or four occasions.
On May 20, 1997, JBE filed this petition to change custody to make him the domiciliary parent. He alleged that since the date of the original custody decree there had been a substantial change in circumstances and that a continuation of the present custody situation was so deleterious to the minor child that a modification of the existing decree was justified and in the best interest of the minor child. AEB filed an answer to the petition and thereafter asserted an exception of no cause of action. The father amended his petition to allege that his four year old child, JE, had been sexually molested by his step-brother, BB. The mother answered the amended petition denying the allegations.
A hearing was conducted on January 22 and January 25, 1999.[1] Dr. Sentell and another psychologist were called as experts on behalf of the father. Dr. Sentell testified that JE was referred to him by Ms. Baxter, a counselor, who had met with JE several times. Dr. Sentell met with JE on three or four occasions between May of 1997 and trial in January of 1999. He testified that during the initial session with JE, which lasted several hours, he administered tests, had JE do some drawings and conducted a clinical interview. At this session JE was very open about what happened with his step-brother and said that BB had sucked his tee-tee. Dr. Sentell testified that the first drawing JE did was phallic in nature and was described by JE as a fish at Wal-Mart. When Dr. Sentell asked JE to draw a picture of a person, he responded by drawing a very realistic person whom he named "BB." The information that JE supplied in the interview was consistent with information that Dr. Sentell had gathered from family members and other sources. By the second and third meetings, Dr. Sentell testified that JE became very reluctant to discuss the incidents with BB and he would quickly change the subject when questioned. The child told Dr. Sentell that the incidents do not happen anymore because he and BB do not take baths or showers together. Dr. Sentell was of the opinion that the child had been coached not to talk about this subject matter. He did not think the incidents of oral sexual contact with BB were fabricated because of the details the child described and because a child would not know of these things unless he had experienced them. Based on information from interviews with JE and paternal family members, Dr. Sentell *759 concluded that oral sexual contact had occurred on several occasions in the bathtub, in the shower and at least once outside. Dr. Sentell did not think that the incidents JE described fell into the realm of normal child play due to the age and size difference between the two children. Dr. Sentell indicated that denial that the acts occurred by the parent that should be protecting the child could cause harm to the child. While Dr. Sentell felt that JE did not display any psychological problems at the present time, except some sexual acting out behavior, this would not decrease the possibility that such problems could occur in the future. It was his recommendation that a safety plan should be implemented involving around-the-clock supervision of the perpetrator and that therapy should be obtained for both the victim and the perpetrator.
Dr. Bruce McCormick, a psychologist, interviewed JE and his father one time on August 6, 1998, at the request of Dr. Sentell. JE was five years old at the time. In response to some general questioning, JE responded that BB was mean to him. After being shown pictures of men and women and identifying body parts, JE told him that BB touched his privates in the bathtub or shower. Later in the interview when JE was asked if he told Dr. Sentell that BB had sucked his tee-tee, he responded "yes, that he [BB] did once and touched his tee-tee once, too." Dr. McCormick thought there was at least "a seventy-five percent likelihood" that inappropriate sexual contact had occurred.
JE's paternal grandmother testified that right before his fourth birthday, JE told her that "when we take our bath, BB puts his mouth on my tee-tee and does like that." The grandmother also noticed changes in JE's behavior around this time in that he used to like to take baths and now he did not want to take baths and he would try to put his head in her crotch instead of just laying his head on her lap and he would try to kiss and bite her on the butt. Around Christmas of 1997 while visiting his grandmother, JE drew a picture of a snowman or a Santa Claus with a penis on it. When she told him "that's not nice," he drew her a picture without the penis.
JE's father testified that JE told him of four instances of oral sexual contact by BBin September and December of 1996 and February and September or October of 1997. He contacted Child Protection Services and the sheriff's office but the contacts did not result in the filing of a complaint. When he told JE's mother about the first incident of sexual contact, she replied to him "that we need to find out who has been doing that to BB."
JE's mother testified that after she remarried in July of 1996, her new husband and his two children moved into her three bedroom home previously occupied by herself, JE and her two sons from her first marriage who were fifteen and fourteen at that time. JE shared a bedroom with one of her sons and BB shared a bedroom with the other. The foyer of the home was converted into a bedroom for her husband's daughter. JE's mother was employed from eight until five at a lumber company. After school, the children attended day care but occasionally she employed a babysitter who looked after them in her home. Before September of 1996, JE and BB would bathe together. When questioned, JE's mother testified that she did not believe that the incidents between JE and BB occurred. She explained that JE's complaints about his penis burning were the result of taking bubble baths and once she stopped letting him take them, the problem went away. After she was contacted by Child Protection following the second incident, she took BB and his sister to see Ms. Baxter "to make sure that her family was OK." She testified that she took the step-daughter one time and took BB every two weeks for about a six month period. She did not pursue Ms. Baxter's recommendation that BB see Dr. Sentell or pursue additional therapy. She left her job at the lumber company in *760 February of 1998 and bought the day care center where the children stayed after school and during the summer, and she worked full time at the day care center during the summer of 1998. In September she sold the day care center and went back to work at the lumber company but many days would leave early to be home with the children after school. If she was not home with the children her husband would stay with them. She testified that after the allegations were made, she added on a bedroom and bathroom to her house and placed a monitor in the bedroom that JE shared with his older half-brother. Although she testified that JE and BB had not been alone together since she was informed of the first incident, there was testimony in the record to the contrary.
AEB's husband's testimony corroborated much of that presented by AEB. Based on the testimony of the professionals and his own observation, he saw no truth to the allegations. He testified that since September of 1996, BB and JE never bathed together again and he and his wife took steps to insure that the two children were not alone. His testimony differed from his wife's on whether BB had seen Ms. Baxter. He testified that he knew of only one occasion that his wife took BB to see Ms. Baxter while she testified that BB saw her on a regular basis for about six months. Because he was injured and on disability, he was presently able to be home when the children came home from school.
Friends and family members of the mother also testified at the hearing that AEB was a good mother concerned about her children's well-being and that the family was a member of a church and attended regularly. The parties stipulated that if custody were changed, JE would remain at the same school.
The trial judge ruled that the parties would continue to have joint custody of JE but changed domiciliary custody from the mother, AEB, to the father, JBE. He found a change in circumstances materially affecting the welfare of JE including the remarriage of AEB, the introduction of BB into JE's life, and the proven instances of inappropriate sexual contact by BB upon JE. The trial judge concluded that JE's father met the heavy burden of proving that JE's interest would be better served by making the father the domiciliary parent with visitation granted in favor of the mother with certain conditions or restrictions including no overnight visitation with the mother when BB was spending the night, that JE was not allowed to be alone with BB at anytime and that adult supervision was required at any time JE and BB were together.
The mother appealed. The court of appeal reversed, finding that the father did not meet the heavy burden of proof set forth in Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), that leaving JE in his mother's home where he had lived all his life was so deleterious that modifying the custody decree was necessary. The court of appeal held that the evidence of inappropriate sexual contact was not shown to be highly probable, and after the initial reports, there was no substantive evidence in the record that repeated episodes occurred during the two and a half years that elapsed since the first alleged incident and trial. The court of appeal found that the father failed to present clear and convincing evidence that the harm that would be caused by changing JE's custody was substantially outweighed by the advantages. The court of appeal returned domiciliary custody to the mother.[2] We granted certiorari to review the correctness of that decision.[3]

LAW
La. Civ.Code art. 131 provides that "[i]n a proceeding for divorce or thereafter, the court shall award custody *761 of a child in accordance with the best interest of the child." Comment (d) to article 131 states that the article should be followed in actions to change custody as well as in those to initially set it. Comment (d) further states that the jurisprudential requirements of Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), are applied to actions to change custody rendered in considered decrees.[4] In such actions, the proponent of change must show that a change of circumstances materially affecting the welfare of the child has occurred since the prior order respecting custody. Bergeron, 492 So.2d at 1195. The party seeking a change "bears the heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child." Bergeron, 492 So.2d at 1200. This burden of proof is imposed as a means of implementing the best interest standard in light of the special considerations present in change of custody cases. Last, the determination of the trial judge in child custody matters is entitled to great weight, and his discretion will not be disturbed on review in the absence of a clear showing of abuse. Bergeron, 492 So.2d at 1196.

DISCUSSION
After reviewing the evidence presented by the parties, we conclude that JE's father has met the heavy burden of proving that due to a change of circumstances that occurred in JE's life, the continuation of the present custody is so deleterious as to justify a modification of the custody decree. The change of circumstances is not based upon one act or incident but results from a combination of factors including the remarriage of JE's mother, the introduction of BB into JE's life, the occurrence of incidents of inappropriate oral sexual conduct perpetrated by BB upon JE and the failure of JE's mother to acknowledge that these incidents occurred and take sufficient steps to prevent any future occurrences. We find that JBE proved by a preponderance of the evidence that incidents of inappropriate sexual contact were perpetrated upon JE by his step-brother, BB. This is supported by the statements made by JE to his father and paternal grandmother and by JE's peculiar behavior after these incidents began to occur. It is further supported by the opinions of Dr. Sentell and Dr. McCormick. Dr. Sentell testified that the information JE related to him was that BB had perpetrated oral sexual contact on him on several occasions. Dr. Sentell did not believe that the events JE described could be fabricated because a child could not know of such behavior unless he had experienced it. Dr. McCormick testified that he thought there was at least a seventy-five percent probability that inappropriate sexual contact occurred. JE's reluctance to discuss the incidents after his initial interview with Dr. Sentell and with Dr. McCormick suggests that it is likely that JE was coached at some point not to talk. Both AEB and her husband testified that they did not believe the incidents occurred. By denying the occurrence of the inappropriate sexual contact, they failed to acknowledge the legitimacy and seriousness of JE's situation. We note that JE's mother did take BB and his sister to see Ms. Baxter at least once "to assure herself that everything was OK," but she and her husband did not seek therapy or counseling for BB as suggested by Ms. Baxter and Dr. Sentell. Although some measures were taken by AEB to keep the boys supervised and apart and AEB made additions to her home and installed a monitoring device, these measures fell short of alleviating the potential for future incidents *762 of inappropriate sexual contact to occur. Dr. Sentell testified that the failure of the mother to afford sufficient protection can cause tremendous problems for JE and allow the perpetration to happen again. While JE may not be showing psychological and emotional damage at the present time, this does not mean that he failed to suffer harm. We consider that JE was harmed in his present environment by the occurrence of the incidents perpetrated by BB upon him. Moreover, it is possible that psychological and emotional damages caused by the situation could manifest themselves in the future. In sum, we conclude that the father has met the heavy burden of proving the present domiciliary custody with the mother, due to the change in circumstances, is so deleterious to the child that a modification of the custody decree is warranted.
Moreover, we think that JE's father has shown by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages. The paramount advantage to changing JE's domiciliary custody is to remove him from the same house where BB resides, thereby eliminating the possibility that future incidents of sexual contact between JE and BB will occur. If JE continues to reside in his mother's home, the threat of perpetration by BB is always present notwithstanding any safety plan that AEB would undertake. In contrast to this threatening environment, JE would be an only child residing in his father's home rather than one of four or five children. JE would attend the same school and church. JBE is the manager of a furniture store in the area and has the flexibility in his work schedule to take and pick up JE from school. JE's paternal grandparents are concerned and loving grandparents who live close to their son and can assist him with caretaking responsibilities. JE would have his own room in his father's house. The disadvantage to changing custody is that JE has lived in the same home all of his life with his mother who loves him dearly and two older half-brothers with whom he is very close, although the oldest half-brother had moved out of the home at the time of trial. However, in weighing any harm likely to be caused by changing domiciliary custody against the advantages, we find that the weight of evidence clearly supports the change of domiciliary custody.
In sum, we conclude that it is in the best interest of JE to change domiciliary custody from his mother to his father. The trial judge did not abuse his discretion in finding that the domiciliary custody of JE should be with his father with the right to specific visitation in favor of the mother. The court of appeal erred in holding otherwise. We must reverse.

DECREE
For the reasons assigned, the judgment of the court of appeal granting domiciliary custody in favor of the mother, AEB, is reversed. The judgment of the trial court granting domiciliary custody in favor of JBE subject to AEB's right to specific visitation is reinstated. All costs of this proceeding are assessed against AEB.
NOTES
[*] Calogero, C.J., not on panel. Rule IV, Part 2, § 3.
[1] The hearing on change of custody did not take place until a year and eight months after the original petition was filed. Some of the delays were due to the fact that JBE changed attorneys three times and the trial judge recused himself requiring the trial to be re-scheduled. Nevertheless, such a long delay in hearing a change of custody case should not have occurred. See Supreme Court General Administrative Rule G, § 6; Supreme Court Rule XXXII, § 1.
[2] 32,647-CA (La.App.2d Cir.8/11/99); 741 So.2d 189.
[3] 99-C-2668 (La.10/8/99); 750 So.2d 172.
[4] A considered decree is an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children. Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98); 708 So.2d 731.