MURPHY, J.
Appellant, Leonard Dazet, Jr., has appealed the trial court judgment designating Melinda Dazet Bedi as primary domiciliary parent of their daughter, Lennie.[1] For the following reasons we affirm the judgment of the trial court.
*566 FACTS AND PROCEDURAL HISTORY:[2]
Mr. Dazet and Ms. Bedi were married on April 10,. 2001. Their daughter, Lennie, was born on June 5, 2001. Mr. Dazet and Ms. Bedi separated on June 13, 2002 and were divorced on April 4, 2003. Initially the parents shared custody, with each parent alternating three-day periods of time with Lennie. On April 16, 2004, the parties were awarded joint custody of Lennie, with Mr. Dazet being designated as the domiciliary parent, and Ms. Bedi having visitation with Lennie every Monday night and Tuesday night. On May 1, 2006, the parties entered into a consent judgment whereby - Ms. Bedi’s visitation was increased over the summers to include every other weekend, in addition to Monday morning through Wednesday morning. The consent judgment provided that during the school year, Ms. Bedi would have visitation every other weekend.
On July 25, 2012, Mr. Dazet filed a Motion to Modify Visitation Privileges. On this same date, Mr. Dazet filed for and was granted a Temporary Restraining Order prohibiting Ms. Bedi from providing Len-nie “with any non-emergency medical treatment, including mental health counseling, pending further orders of this Court.” On July 30, 2012, Ms. Bedi filed a Motion for Contempt of Court and Change of Custody. It is unclear from the designated appellate record whether there was a ruling on these particular motions. On August 13, 2012, the Court ordered that the parties attend counseling at Families for Life.
On August 13, 2012, Ms. Bedi filed a Motion to Modify Custody, For the Implementation of Co-Parenting Guidelines, and For a Holiday Visitation Schedule. This motion was set for hearing on October 28, 2012 but the designated appellate record does not contain a ruling on this motion. On May 13, 2013, the trial court rendered a judgment denying Ms. Bedi’s Motion for Additional Visitation[3] during the summer of 2013. On that same date, the trial court issued an Order for Evaluation regarding custody and visitation. On August 26, 2013, the trial court issued an interim order allowing Lennie to attend an out of state vacation with Ms. Bedi. In addition, this order granted Ms. Bedi overnight visitation on Thursday nights as suggested by the evaluator. This was in addition to the every other weekend visits Ms. Bedi continued to exercise. On October 18, 2013, the trial court rendered judgment maintaining Mr. Dazet as primary domiciliary parent, and awarding Ms. Bedi overnight visitation every Thursday night and every other weekend during the school year, and alternate weeks during the summer. In addition, this judgment ordered specific holiday visitation including the specific time period each visitation was to last. The judgment also ordered that the parties resume counseling at Families for Life. The trial court found that Mr. Dazet was in contempt of court for withholding visitation with Lennie from her mother. Rather than sentence Mr. Dazet for contempt, he was “allowed to purge himself of said contempt upon his making a good faith effort to obey the outstanding orders of this court.”
The designated appellate record indicates that the parties appeared in the trial court on April 7, 2014. On that date, a judgment was rendered specifying that during the summer months when the parties alternate weeks with Lennie, Ms. Bedi has the first full week after school ends, *567 specifying the pickup and delivery time is ] ..¡Sunday at 6 p.m. The judgment also specified visitation for the times during the school year when Lennie is not in school.
On May 19, 2015, Mr. Dazet filed a Motion to Allow Minor Child to Attend Enrichment Classes, Modification of Visitation, and for Contempt. In this motion,. Mr. Dazet requested the visitation schedule be modified to allow Lennie to attend a two week summer program at Archbishop Chapelle High School, that Thursday night visitation be discontinued, and requesting that Ms. Bedi be held in contempt for denying his visitation on January 3, 2015. On July 7, 2015, Ms. Bedi filed a Motion for Sole Custody, Change of Visitation and Contempt. On July 15, 2015, Mr. Dazet filed an Exception of No Cause of Action in opposition to the Motion for Sole Custody. The trial court held a hearing on these motions on July 20, 2015 and denied the Exception of No Cause of Action. The custody issue was taken under advisement. On July 28, 2015, the trial court rendered judgment designating Ms. Bedi as primary domiciliary parent, granting Mr. Dazet overnight visitation' every Thursday and every other weekend, alternating weeks during the summer, and specifying visitation for holidays. The judgment also awarded Ms. Bedi an additional four days and nights of visitation to make up for times that she was deprived of visitation during the past year. On August 10, 2015, Mr. Dazet was granted a devolutive appeal from the July 28, 2015 judgment.
LAW AND DISCUSSION:
Exception of No Cause of Action
In his first assignment of error, Mr. Dazat argues that the trial court erred in denying his Exception of No Cause of Action, claiming that Ms. Bedi’s Motion for Sole Custody does not meet the threshold requirements set forth in Bergeron v. Bergeron, 492 So.2d 1193, 1200 (La.1986).
Although an interlocutory judgment, such as the denial of exceptions, is generally not appealable, an interlocutory judgment is subject to review on appeal when an appealable judgment has been rendered in the case. Hancock Bank of La. v. 3429 H, LLC, 15-355 (La.App. 5 Cir. 1/13/16), 184 So.3d 274, 279.
In the context of the peremptory exception, a cause of action is defined as the operative facts that give rise to the plaintiffs right to judicially bring the action against the defendant. Foret v. Caruso, 15-682 (La.App. 5 Cir. 3/16/16), 194 So.3d 643. The function of this exception is to test the legal sufficiency of the petition, by determining whether the law affords a remedy on the facts alleged in the pleading. Id. In ruling on this exception, the court accepts well-pleaded allegations of fact as true to determine whether, on the face of the petition, the plaintiff is legally entitled to the relief sought. Id. On appeal, a de novo review is conducted on the ruling of an exception of no cause of action, asking the question of whether, in the light most favorable to plaintiff and with every doubt resolved in plaintiffs behalf, the petition states any valid cause of action for relief. Id.
In Bergeron, supra, the court held that a party seeking to modify custody has the burden of proving that maintaining the present custody is “so deleterious to the child” as to justify a change of custody or of proving that the harm which may be caused from a change is outweighed by its benefits to the child. Bergeron, 492 So.2d at 1200. This burden of proof to change a custody degree should be heavy in order to protect children from the detrimental effects of “too liberal standards in custody change cases.” Id. This heavy burden has been extended to any petition to modify *568 custody. Menge v. Menge, 545 So.2d 674, 676, (La.App.5 Cir.1989).
In her Motion for Sole Custody, Change of Visitation, and Contempt, Ms. Bedi alleged that Mr. Dazet habitually violated the orders of the court by withholding the child on the mother’s visitation days, calling the police when he attempted to pick up the child on a date that was not his visitation, failure to share information from the child’s school with the mother, failing to seek “professional services”[4] for the child, failing to seek medical care for a curvature in the child’s spine for over two years, and failure to seek medical care for the child who has “undergone changes due to puberty.” We find that the allegations set forth in Ms. Bedi’s motion are sufficient to state a cause of action alleging that the present custody is so deleterious to the child that modification is needed. Thus, the trial court correctly denied Mr. Dazet’s Exception of No Cause of Action.
Designation of primary domiciliary parent
In his second assignment of error, Mr. Dazet argues that the trial court erred in changing the primary domiciliary parent of. Lennie to Ms. Bedi “in reliance on unsupported and uncorroborated allegations” by Ms. Bedi. He contends that Ms. Bedi did not meet the requirements for change in custody set forth in Bergeron, supra, and the trial court failed to address the requirements of La. C.C. art. 134.
La. C.C. art. 131 instructs that “[i]n a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child.” “The primary consideration in a determination of child custody is the best interest of the child. This applies not only in actions setting custody initially, but also in actions to-change custody.” Mulkey v. Mulkey, 12-2709, (La. 5/7/13), 118 So.3d 357, 364.
Our jurisprudence has recognized a distinction between two types of custody awards. One type of custody award is a “considered decree;” this “is an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children.” Id. A second type of custody award is a “stipulated judgment,” which is rendered “when-the parties consent to a custodial arrangement, and no evidence' of parental fitness is taken.” Evans v. Lungrin, 97-0541 (La. 2/6/98), 708 So.2d 731, 738.
The jurisprudence has applied different burdens of proof to a party seeking to change each of the two types of custody awards. In an action to change custody rendered after a considered decree, the party seeking the change must show that a change of circumstances materially affecting the welfare of the child has occurred since the prior order of custody. Tracie F. v. Francisco D., 15-1812 (La. 3/15/16), 188 So.3d 231, 239. Furthermore, for a considered decree, the party seeking a change “bears the heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.” Id. (quoting Bergeron, 492 So.2d at 1200).
There is no question that the October 18, 2013 judgment maintaining Mr. Dazet as primary domiciliary parent was a considered decree. Thus, Ms. Bedi had the *569 burden of proving that there was a change in circumstances materially affecting Len-nie that had occurred since the October 18, 2013 order, making the continuation of the present custody so harmful to Lennie as to justify a modification, or that the harm that could result from the change of custody is outweighed by its benefits to Lennie.
At the hearing on the Motion for Sole Custody, Ms. Bedi testified that in 2012, she brought Lennie to the St. Charles Parish Community Health Center and it was noted that she had a curve in her spine. She was referred to an orthopedist for further evaluation. During this office visit, Lennie was administered certain immunizations. Mr. Dazet testified that he had already scheduled an appointment for Lennie to receive immunizations from another physician. On July 25, 2012, Mr. Dazet filed for and was granted a Temporary Restraining Order prohibiting Ms. Bedi from providing Lennie “with any non-emergency medical treatment, including mental health counseling, pending further orders of this Court,”
At the hearing on the Motion for Sole Custody, Mr. Dazet acknowledged that on January 24, 2014, Ms. Bedi gave him a copy, of a doctor’s report regarding Len-nie’s back. In this same communication, Ms. Bedi referred to the curvature in Len-nie’s back from two years earlier and stated that Lennie was to go to Dr. Comroy. Ms. Bedi asked that she be notified of the appointment time. Ms. Bedi also asked Mr. Dazet if she could take Lennie to a gynecologist since she had started menstruation. In addition, Ms. Bedi explained that she thought Lennie should be brought in for counseling. Mr. Dazet testified that he called “the doctor” who stated that “if there were no problems there was no need for back checkup and she had no problems with it.” Mr. Dazet also acknowledged receipt of a written communication from Ms. Bedi dated April 24, 2014 in-which Ms. Bedi wrote “you will need to take her to the pediatrician to get a referral to the orthopedist or I would be happy to take her back here to see Michelle Comroy and get the referral.” Mr. Dazet again testified that “the doctor” said'there was no need to follow up. Mr. Dazet could not remember whether this conversation wherein the doctor stated there was no need to follow up took place after the January 24 correspondence or the April 24 correspondence.
On May 14, 2014 Mr. Dazet informed Ms. Bedi that Lennie was trying out for cheerleading. Ms. Bedi responded that she had no problem with this, but asked if Mr. Dazet had made an appointment regarding Lennie’s back. Mr. Dazet testified that on January 27, 2015, he wrote correspondence to Ms. Bedi stating that he had called the doctor and was told Lennie “was supposed to do no followup [sic] appointment because it has been so long with no problem.” Lennie stopped cheerleading before the end of the school year. Mr. Dazet testified that she was “board [sic] with it” but Ms, Bedi stated it was because her back hurt. In response to further questioning about taking Lennie to the doctor for her back, Mr. Dazet responded that Ms. Bedi had enough time before he filed the restraining order prohibiting Ms. Bedi from taking Lennie for non-emergency medical care to take Lennie to a doctor. At the time of the hearing on the Motion for Sole Custody, Lennie had not been to a follow up appointment with a doctor concerning curvature of her spine, nor had she been examined by a gynecologist, or taken for counseling. At the hearing,- Mr. Dazet produced documentation of an appointment for Lennie to have an annual physical by a doctor on July 21, 2015. Ms. Bedi stated that this was the first time she had been notified of this appointment.
*570 Ms. Bedi testified that Mr. Dazet had been notified by someone at Lennie’s school that Lennie was cutting herself, but Mr. Dazet did not share that information with Ms. Bedi. Later, the principal of Len-nie’s school informed Ms. Bedi that there was a problem with several children at Lennie’s school cutting themselves. Ms. Bedi testified that in the summer of 2014 she noticed cuts on Lennie’s thighs and she asked Mr. Dazet if he would bring Lennie for counseling. Ms. Bedi testified that Lennie cut herself with a utility knife. When questioned as to whether he noticed cuts on Lennie’s thighs, Mr. Dazet said these were scratches from Ms. Bedi’s cat. Mr. Dazet testified that when Lennie is at Ms. Bedi’s house, the other children throw the cat on Lennie, the cat is mean and it scratches Lennie. Ms. Bedi stated that her cat is de-clawed. Mr. Dazet testified that he was not aware that Lennie had friends who had cuts on their legs or that one of them had to go into the hospital due to cutting herself. Mr. Dazet did not take Lennie to counseling for cutting herself.
When the parties attended counseling at Families for Life, they were encouraged to communicate and post activities and events on a computer program called the “Family Wizard.” Ms. Bedi testified that Mr. Dazet entered information on this program when it benefitted him but did not enter other information on the program, even when she asked him for this information. When questioned as to how he kept Ms. Bedi informed of information regarding Len-nie’s education and extracurricular activities, Mr. Dazet stated that he would send papers home with Lennie to give to her mother. He would call Lennie who informed him that she had given the papers to her mother. Ms. Bedi testified that she was not given papers from school and that Mr, Dazet did not inform her regarding dates of events and activities. The record indicates that Mr. Dazet not only failed to communicate the date of Lennie’s eighth grade graduation to Ms. Bedi, Mr. Dazet wrote the wrong date in court papers, indicating his intention to prevent Ms. Bedi from attending this important event. Ms. Bedi testified that when she asked Mr. Dazet for information about certain events, including eighth grade graduation, she was told to obtain the information from the school website. Ms. Bedi testified that certain events were not put on the school website and at other times the information on the school website was inaccurate.
Ms. Bedi testified that according to the holiday visitation schedule she had visitation with Lennie for Easter 2015. When she went to pick Lennie up from school the Thursday before Easter for her regular Thursday night visitation, she was told that Mr. Dazet had already picked up Len-nie. When she called Mr. Dazet to ask why he had picked up Lennie since it was her visitation, Mr. Dazet stated that spring break started when school was dismissed, so it was actually his visitation. Ms. Bedi pointed out that the visitation order states that Mr. Dazet’s visitation should have started that evening at 6 p.m. Mr. Dazet did not return Lennie to Ms. Bedi until 6 p.m. on the Saturday before Easter, even though that weekend was Ms. Bedi’s regularly scheduled visitation. During this testimony, the trial court stated that Mr. Dazet’s interpretation of the visitation schedule was “foolish” because a school holiday did not prime weekend visitation. Ms. Bedi testified that in the past when she had agreed to an adjustment in the visitation schedule so that Mr. Dazet could spend some of her designated visitation time with Lennie in exchange for Ms. Bedi spending what would have been Mr. Daz-et’s visitation time with Lennie, Mr. Daz-et reneged on the agreement. The result is that Mr. Dazet got his visitation time and Ms. Bedi’s visitation time also.
*571 Ms. Bedi testified that she had three other children living in her home and that Lennie has her own room and received new furniture for her room on January 3, 2015. Mr. Dazet does not have any other children who live in his home.
In determining the best interest of the child, the trial court is guided by the factors listed in La. C.C. art. 134, which are:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
The court is not required to make a “mechanical evaluation” of each factor. Bonnette v. Bonnette, 15-0239 (La.App. 4 Cir. 2/17/16), 185 So.3d 321, 332, writ denied, 16-0663 (La. 5/20/16), 191 So.3d 1072. The weight to be given to each nonexclusive factor listed in article 134 is left to the discretion of the trial court. Hodges v. Hodges, 15-0585 (La. 11/23/15), 181 So.3d 700, 703. The list of factors is illustrative which allows the court the freedom to consider additional factors. Id. As such, the court should consider the totality of the facts and circumstances of the individual case. Id.
The trial court has great discretion in awarding custody; consequently, a custody award will not be disturbed on appeal in the absence of a clear showing of abuse. AEB v. JBE, 99-2668 (La. 11/30/99), 752 So.2d 756, 761.
In his extensive reasons for judgment the trial court stated that Ms. Bedi’s “demeanor on the witness stand was that of a caring, confident mother who wanted to be primary at this stage” of Lennie’s life. The trial court found Ms. Bedi “to be an extremely believable, credible witness.” On the other hand, the trial court “did not believe much” of Mr. Dazet’s testimony. The trial court described Mr. Dazet’s “demeanor on the stand” as “that of a manipulative, argumentative person who would never answer a question directly, but instead gave argumentative and spiteful answers to almost every question.” The trial court noted that Mr. Dazet’s actions “seemed determined to take” Ms. Bedi “out of the child’s life,” as shown by an ex parte order filed in an attempt to take *572 some of Ms. Bedi’s visitation without a hearing. The trial court stated that Mr. Dazet seemed “like he doesn’t want to be bothered with keeping” Ms. Bedi informed of Lennie’s activities and events. The trial court noted that Mr. Dazet was “condescending of the mother’s involvement in the child’s life, as shown by consistently interjecting negative things about the mother in his testimony whenever he saw an opportunity to do so by taking constant verbal jabs at her at every opportunity.” The trial court found that Mr. Dazet’s “open and ongoing hostility towards” Ms. Bedi and “his ongoing antics which have basically stonewalled and sandbagged” Ms. Bedi’s “rights every step of the way since thé last custody rule are substantial sources of stress” in Lennie’s life. “Based on the totality of the circumstances of this case, the court is convinced that Lennie is cutting herself and is in need of professional help.” Based on all of the evidence presented at trial, the trial court concluded that the “current h giving arrangements are deleterious to the child’s well-being and that it would be in the child’s best interests to name the mother the primary domiciliary parent and have the child reside primarily with the mother.” Our review indicates that the trial court’s findings of fact are abundantly supported by the record.
The trial court did not perform a mechanical evaluation of each of the factors listed in La. C.C. art. 134. The record contains evidence as to most of these factors. Many of the factors listed in article 134 are neutral in this case.[5] Regarding factors one through three, it is clear from the record that both parties have love, affection, and emotional ties to Lennie, as well as the capacity to continue her education and rearing, and provide for her material needs. Regarding factors seven and eleven, both parties have the mental and physical health to care for Lennie, and their respective homes are 15-20 miles apart. Regarding factor eight, while Len-nie had attended Catholic school while Mr. Dazet was named domiciliary parent, Ms. Bedi testified as to her positive experiences with the public school system in St. Charles Parish. Regarding factors five and eight, Ms. Bedi has lived at her current address for eight years and she and her husband are involved in the community. Ms. Bedi also described the chores assigned to Lennie at her home, as well as her recognition of the fact that Lennie is “adept at playing both parents against each other.” Regarding factors four and twelve, while Mr. Dazet had been named domiciliary parent for the majority of Len-nie’s life, Ms. Bedi had always been involved in Lennie’s care, despite the fact that she has several other children. Regarding factor ten, the testimony made it painfully clear that Mr. Dazet does not facilitate or encourage Lennie to- have a relationship with her mother. With regard to medical care (listed in factor 3), the testimony indicates that although Mr. Daz-et may bring Lennie to the doctor for annual checkups, he | ^prevented Ms. Bedi from seeking any kind of non-emergency medical care for Lennie, going so far as to obtain a restraining order barring Ms. Bedi from obtaining non-emergency medical care for Lennie. The record indicates that Mr. Dazet ignored Ms. Bedi’s repeated requests to have Lennie’s back examined by an orthopedist, to take Lennie to a gynecologist, and to take Lennie to a counselor.
*573 Considering the totality of the circumstances in this case, we agree with the trial court that Ms. Bedi carried the burden of proving that the current custody arrangement was so harmful to Lennie’s well-being that it is in Lennie’s best interest to name Ms. Bedi as primary domiciliary parent.
CONCLUSION
Having reviewed the record and the trial court’s findings, we find no manifest error in the July 28, 2015 judgment. Moreover, we are profoundly aware of the great deference owed to the trial court in this case, who has extensive experience dealing with these parties in this custody matter, which has spanned thirteen years. Accordingly, we affirm the trial court’s well-reasoned judgment designating Ms. Bedi as the primary domiciliary parent.
AFFIRMED

. Although the child’s name is spelled “Lenny” in the transcripts, her name is spelled “Lennie” in communications between her parents.

. The facts and procedural history are taken from the designated appellate record.

. The motion regarding this hearing is not contained in the designated appellate record.

. The record indicates that the trial court had ordered that the child attend counseling at Families for Life. Mr. Dazet terminated the counseling services.

. With regard to factor nine, the record contains no indication of Lennie's preference of which parent should be named domiciliary. Nor is there any indication in the record that either parties’ moral fitness affects the welfare of Lennie (factor six).