STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 08-1349

L.E.P.S.

VERSUS

R.G.P.

**********

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CATAHOULA, NO. 19,698
HONORABLE JOHN RAY JOYCE, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Sylvia R. Cooks, John D. Saunders, Marc T. Amy, J. David Painter, and Shannon J. Gremillion, Judges.

Cooks, J., concurs in part and dissents in part and assigns written reasons.

Painter, J., dissents and assigns written reasons.


**REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

Richard L. Fewell Jr.
Law Office of Richard Fewell
1315 Cypress St.
West Monroe, LA 71291
(318) 388-3320
Counsel for Defendant/Appellee:
R.G.P.

James Edward Paxton
Attorney at Law
P. O. Box 97
St. Joseph, LA 71366
(318) 766-4892
Counsel for Defendant/Appellee:
R.G.P.


Paul A. Lemke
Attorney At Law
P. O. Box 595
Harrisonburg, LA 71340
(318) 744-5431
Counsel for Plaintiff/Appellant:
L.E.P.S.

**GREMILLION, Judge.**

The plaintiff, L.E.P.S., appeals the judgment of the trial court in favor of the defendant, R.G.P., naming him the primary domiciliary custodial parent of their triplet daughters.[1] For the following reasons, we reverse and remand for proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

L.E.P.S. and R.G.P. married in April 1988 and divorced in May 1997. Of that union, triplet daughters were born to L.E.P.S. in 1992, via in vitro fertilization. Although the girls are not R.G.P.'s biological children, he is their legal father. Following the divorce, R.G.P. and L.E.P.S. were granted joint custody of the girls with L.E.P.S. being designated the primary domiciliary parent.

In October 1997, R.G.P. filed a motion to amend custody urging that he should be named the primary domiciliary parent. In November 1997, L.E.P.S. filed a rule for contempt and to modify custody urging that R.G.P.'s visitation should be suspended for a variety of reasons including that the children were primarily cared for by R.G.P.'s parents, R.P. and R.G.P., Sr. In February 1998, L.E.P.S. filed a rule for contempt against R.G.P., Sr. for refusing to appear at a deposition. Thereafter, a joint motion to dismiss the rule for contempt was filed following R.G.P., Sr.'s appearance and deposition.

In November 1998, L.E.P.S. married R.F. In September 2002, L.E.P.S. filled a rule for contempt and to fix interim child support and motion to refix hearing on motion to compel concerning the girls' child support award. In December 2002, R.G.P. filed a motion to request additional visitation. L.E.P.S. divorced R.F. in June 2001. Of that union, one child was born in 2000.

---

[1]Pursuant to Uniform Rules—Courts of Appeal, Rule 5-2, we use initials throughout to protect the identity of the minors.

In November 2003, R.G.P. filed an objection to relocation of child, urging that L.E.P.S. not be allowed to move the triplets to Slidell, Louisiana. L.E.P.S. responded with a rule for sanctions. The record includes a "Notification of Move" signed by R.G.P. in July 2003, detailing the move and noting that "both parties waive the restriction in the May 29, 1997 Joint Custody Implementation Plan of not being allowed to cohabitate with persons of the opposite sex." L.E.P.S. admitted that she was moving to Slidell to cohabitate with a man to whom she was not yet married. L.E.P.S. later married J.S. in November 2006.

In February 2007, R.G.P. filed an objection to relocation of minor children urging that L.E.P.S. not be allowed to move the children to Otterberg, Germany. He further requested that he be named the primary domiciliary parent. In June 2007, R.G.P. filed a rule for contempt of court, attorney fees, and cost of court. Following a hearing in May 2007, the trial court found that it was not in the children's best interests to relocate to Germany. L.E.P.S. thereafter filed an application for new trial urging that the district court in St. Tammany Parish ruled that L.E.P.S. could move her child, the seven-and-a-half year old half-sister of the triplets, to Germany, and that breaking up the nuclear family would not be in the best interests of the triplets. The Catahoula trial court partially granted L.E.P.S.'s motion for new trial in order to consider the St. Tammany Parish court's relocation ruling regarding the triplets half-sister. The trial court still found that the relocation was not in the triplets' best interests. Thereafter, L.E.P.S. moved back to Jonesville, Louisiana, while her husband remained in Germany to work.

In January 2008, R.G.P. filed a motion to modify visitation and for ex parte order regarding custody exchanges. He desired that his mother be allowed to

2

pick up the girls for custody exchanges and that the custody arrangement be modified so that time was split evenly. Following a hearing the trial court found it would be in the triplets' best interest to modify the previous custody order naming L.E.P.S. the primary domiciliary parent during the school year and R.G.P. the primary domiciliary parent during the summer.

In March 2008, L.E.P.S. filed a petition for custody urging that due to R.G.P.'s substance abuse problems and arrests for Felony Carnal Knowledge of a Juvenile in Tensas Parish and Contributing to the Delinquency of a Minor in Franklin Parish, it would be in the triplets' best interest if she were awarded sole custody of them.

In June 2008, following receipt of a certified letter from L.E.P.S. stating her intent to move the triplets to Yuma, Arizona, R.G.P. filed a motion for temporary restraining order and request for preliminary injunction prohibiting L.E.P.S. from moving the triplets out of Catahoula Parish. In July 2008, L.E.P.S. filed a motion for temporary relocation and a petition to set child support and for judgment of arrearages. Shortly thereafter, R.G.P. filed a rule for contempt of court, attorney fees and cost of court. R.G.P. also filed a motion to consolidate.[2]

Following a July 31, 2008 hearing the trial court found L.E.P.S. in contempt of court for taking the children to Yuma, Arizona against court orders. It further found that it would not be in the best interests of the children to relocate to Yuma, Arizona nor would it be in their best interest if L.E.P.S. were granted sole custody. It awarded L.E.P.S. and R.G.P. joint custody, naming R.G.P. the primary

---

[2]In January 2008, one of the triplets, then fourteen years old, gave birth to a son. The alleged father, through his mother, sought a determination of filiation and a desire that his son not be moved to Yuma, Arizona. R.G.P. sought to consolidate the alleged father's action with his own to prevent inconsistent rulings.

3

domiciliary parent under the direct supervision of mother until R.G.P.'s pending criminal matters could be resolved. L.E.P.S. now appeals.

## ISSUES

L.E.P.S. assigns as error:

1.  The trial court's refusal to hear the testimony of Deputy Coleman and R.G.P. concerning his arrest for carnal knowledge of a juvenile and contributing to the delinquency of a juvenile.

2.  The trial court's refusal to drug test R.G.P. after assertion and confirmation of the Fifth Amendment privilege against self-incrimination. Additionally, the trial court failed to apply any adverse inference against R.G.P. after he took the Fifth Amendment privilege thirty-one times during testimony.

3.  The trial court's grant of joint custody of the minor children with the father designated as domiciliary custodian, subject to supervision by the maternal grandmother.

4.  The trial court's failure to grant sole custody of the children to her.

5.  The trial court's failure to grant her visitation and failure to follow the statutory mandate of La.R.S. 9:335 in issuing a joint custody implementation plan.

## TESTIMONY

The record of this protracted custody dispute includes testimony from various hearing over the years. The following testimony was adduced at the hearing regarding L.E.P.S.'s desire to move the triplets to Germany.

R.G.P. testified that he had been living with his mother in Ferriday for approximately six weeks following a four-wheeler accident in which he broke five ribs and punctured his lung. He stated that he manages a family-owned farm in Tensas Parish. R.G.P. stated that he drinks alcohol sometimes on the weekends. He

4

admitted to taking illegal drugs in the past including methamphetamines, crack, and cocaine for which he was sent to rehab to by the trial court for sixty days in February 2005, following an arrest for possessing drug paraphernalia. At that time, the triplets were thirteen years old. R.G.P. testified that he no longer associates with his former friends who were drug users. R.G.P. further admitted that he arrived at a custody exchange in 2006 too drunk to drive, so he had his ex father-in-law drive the girls.

R.G.P. went on to state that his former girlfriend, with whom he used drugs, became injured when he accidentally shot her in the leg. He stated that at the time the triplets were four years old.

R.G.P. testified that the triplets are active in softball and gymnastics. He stated that he pays $1500 per month in child support and that his mother writes the checks, but he signs them. He further stated that his mother, a former teacher, assists the triplets with any help they need related to school. R.G.P. admitted to signing a document stating that the girls could move to Slidell, but that after talking to his lawyer and mother, he changed his mind because it was "something to do." He further stated that he has lived for the past two years in a camp, owned by his mother, in Tensas Parish. He stated that when the girls visit they stay at his mother's house. R.G.P. admitted to allowing the fourteen-year-old boyfriend of one of his daughters to sleep over at the camp one weekend while the girls were visiting. This triplet later became pregnant by the boy and had a son when she was fourteen years old.

G.E., L.E.P.S.'s father, testified that the triplets have close relationships with he and his wife and with their paternal grandmother.

L.E.P.S. testified that one of the main reasons she divorced R.G.P. was because of his substance abuse problems. She further testified that he shot a gun over

her head once and hit her across the back with one of his crutches.  She testified that he drank often.

At the February 2008 hearing, V.P. testified that she was comfortable with her mom keeping her infant son, and that she did not think her dad would be able to watch him. She testified that she did not want to do a week-to-week arrangement because she felt it would be too difficult.  E.P. testified that she wished for the custody arrangement to stay the same and that she wanted to stay with her mom during the week.  S.P. testified to the same.

At the hearing held from July 31 to August 1, 2008, R.G.P. invoked his Fifth Amendment privilege on all questions concerning drug use. L.E.P.S.'s counsel then requested immediate urinalysis drug testing of both parties, which the trial court denied.  Counsel further requested that an adverse inference be issued against R.G.P. for refusing to testify.  R.G.P. admitted to a continuing association with P.S., the woman he previously used drugs with and accidentally shot in the leg.  Again, however, he refused to testify with regard to questions surrounding an arrest for possession of crack cocaine.  R.G.P. continued to assert the privilege when questioned about his involvement with a fifteen-year-old-girl and various other issues.  He admitted to having past drug problems and an ongoing drug problem. When questioned whether or not he believed the girls would be better off in his custody or L.E.P.S.'s custody he responded, "I don't know." Further, when questioned whether it was he objecting to the relocation or someone else, R.G.P. responded "Both me and my mother."  The colloquy continued:

> Q:     So if you're given custody of these children are you going
>            to raise them, are they going to be in your custody or are
>            they going to be in your mother's custody?

A.     Both our custody.

Emmit Coleman, chief investigator of Franklin Parish, testified he investigated a case against R.G.P. in March 2008. He stated that he took a statement from a fifteen-year-oldjuvenile. The trial court would not allow any questions regarding the substance of that statement.

Deputy Mulvihill with the Concordia Parish Sheriff's Office testified that he knows R.G.P. because of encounters with him due to illegal drug activity. He stated that in May 2008, he entered a home in which R.G.P. and P.S., the gunshot victim, were in a home where narcotics where found. He stated that he issued R.G.P. a citation for possession of drug paraphernalia, specifically a crack cocaine smoking pipe found in his boot.

P.S. testified that she and R.G.P. have had an on-and-off relationship since 1997, and that R.G.P. has an ongoing drug problem. She testified that she has seen him use drugs. She further testified that "L.E.P.S. is a wonderful mother," and that if she had to pick between L.E.P.S. and R.G.P. she would choose L.E.P.S. "by all means."

L.E.P.S. testified that the home she and her husband purchased in Yuma, Arizona, is 3400 square feet with five bedrooms, three bathrooms, and a pool. She discussed the educational opportunities available to the girls in Arizona. L.E.P.S. further testified that besides R.G.P.'s drug use, his mother's interference in their relationship was partially the reason for their divorce. She was of the opinion that R.G.P. is dependent on his mother, that his mother makes all the decisions, and that he has only worked for his mother.

S.P., who was fifteen at the time of this trial, testified that she did not

want to go to Arizona because she wanted to stay in Jonesville with her friends and family and graduate from Block High School. She stated that she would prefer to stay with R.P. and her dad. Nevertheless, she testified that L.E.P.S. has been her primary caretaker: the person who takes her to the doctor, buys her clothes, and attends all of her softball games. She stated that although she wants to live with her mother, she does not want to move to Arizona. S.P. further testified that she has seen R.G.P. drunk and that she worries about his problems.

E.P. additionally testified that she does not want to move to Arizona because she wants to finish school at Block and because all of her friends and family are located there. She testified that she would live in Ferriday with her grandmother and dad.

V.P. testified that she would like to finish school at Block. She stated that she would live with her grandmother and her dad if she were allowed to stay here, but that she was not sure if she would live in Ferriday or Jonesville. V.P. was asked if she feels safe when she is with R.P. and R.G.P. to which she responded, "most of the time." She further explained that she can tell sometimes when her dad has been drinking. She stated that her mom and maternal grandmother have taken care of her infant son while she is in school, but that R.P. would take care of him if she stayed.

R.P. testified extensively as to the supervisory role she would have if R.G.P. were awarded custody, which included attending the girls' extracurricular activities, helping with homework, and assisting in the care of V.P.'s son. R.P. admitted to suing L.E.P.S. in the past attempting to gain custody of the girls due to L.E.P.S.'s "moving around." When questioned if her son would be a better custodial

parent, R.P. replied, "It depends on what issue it is." She further explained "It's probably about equal." R.P. testified that if R.G.P. were using drugs out of the presence of his daughters, that would not change her opinion that he should be awarded custody. R.P. testified that R.G.P. lives in Newellton in a house she owns and that he is registered to vote in Concordia. She stated R.G.P. recently purchased a house in Jonesville for the purposes of establishing a domicile in the area so that the girls could continue to attend Block high school.

## DISCUSSION

In its ruling, the trial court found (emphasis added):

The Court finds that both parents dearly love these children and are dedicated to their well being. The Court also finds that the children have a genuine love for both of their parents and expressed no dissatisfaction as it relates to either parent. The Court finds that the Triplets have been in the Harrisonburg-Jonesville area for the last few years of their life and they seem to have adapted well to that area of the State. The Triplets, in open court, have expressed their ties with the local school, the churches, their families and the extended families of both the Mother and the Father and have expressed this at this hearing as they did at the previous Relocation Rule that their desire is to remain in the Harrisonburg-Jonesville-Ferriday area. *The Court is aware that [R.G.P.] has pending criminal matters in other parishes and was made aware of that by the adjustment in the joint custody agreement whereby there was required supervision*, by [R.P.] of any visitation that [R.G.P.] had with the Children. *The Court also notes that [ R.G.P.] has had in the past and may still possibly have a substance abuse problem*, however the girls when questioned about this substance abuse problem said that they had never seen [R.G.P.] under the influence of substances other than one time when [R.G.P.] had apparently had too much to drink and allowed his Father-in-law to drive in lieu of himself. The Court does sense that [L.E.P.S.] does not display a willingness and ability to facilitate and encourage the close continuing relationship between the children and other party and Court senses that [L.E.P.S.] may be using the relocation to thwart the relationship of the children and the father.

The Court finds the physical needs and material needs of the Children will be adequately provided by both the Father and the Mother as it relates to these girls. As previously referenced the girls, all three (3), have expressed a desire to stay with their Father and live in the house with their Father, their Paternal Grandmother, [R.P.]. The Court

9

will note that the Children expressed that if they were to move to Yuma, Arizona the only persons they would know there would be their Mother, their Step-father, their Half-sister, and their Step-sisters, however they would have numerous friends and extended families if they were to remain in the Harrisonburg-Jonesville, Catahoula-Concordia Parish area. One of the persons whom they would know in Yuma, Arizona is their Step-Father, [J.S.]. The Court will note that in the previous hearings [J.S.] has not been present for any of the hearings for the Court to know, see or hear from the person that would be a very influential factor in these girls' lives, if relocated to Yuma, Arizona.

Based on the factors as set out by the Legislature in both relocation and custody matters, I find that[ L.E.P.S.] has not met her burden of proof to establish that it is in the best interest of the Children that they be relocated to Yuma, Arizona and she has failed to establish that it would in the best interest of the Children for [L.E.P.S.] to have sole custody of these children in lieu of joint custody.

It is therefore the finding of this Court that the relocation of the Triplets is denied and the request of Sole Custody by [L.E.P.S.] is denied. The Parties will be awarded Joint Custody of the Triplets with *[R.G.P.] being awarded the domiciliary parent under the direct supervision of [R.P.] his Mother and Paternal Grandmother of these Children until the criminal matters can be resolved.* Should [R.G.P.'s] criminal matters be resolved to his detriment the Court would have to, out of necessity, revisit the Custody matters that it has set out.

## EVIDENTIARY ISSUES

In this first assignment of error, L.E.P.S. argues that the trial court erred in refusing to admit the testimony of Deputy Coleman and R.G.P. concerning his arrest for carnal knowledge of a juvenile. We agree.

We first note that it is clear that the trial court did indeed consider the pending criminal charges against R.G.P. since it qualified its domiciliary placement with R.G.P. by requiring the supervision of his mother *until the criminal matters [could] be resolved.* Moreover, R.G.P. admits in his own brief that "these arrests, however, were not beyond the trial court's knowledge," and "the judge admits knowledge of the criminal charges." Thus, although the judge refused to admit the proffered testimony into evidence, he clearly considered it when making his

10

determination. R.G.P. argues that a harmless error standard applies , i.e., the error in failing to admit the proffered testimony into evidence was harmless since the judge considered it. We view the situation differently. The question is not whether he should have considered the evidence; the fact is that he did. The question is whether he abused his discretion in awarding R.G.P. custody in light of all of the evidence including that which he excluded.

Additionally, we find it was error to not admit the evidence into the record. R.G.P.'s arrests are highly relevant to R.G.P.'s moral fitness to parent triplet fifteen year old girls. Although La.Code of Evid. 609(F) generally prohibits the admission of the arrest of a witness in order to attack his credibility, there are some exceptions. Louisiana Code of Evidence article 1101(B) provides for the limited applicability of the rules concerning the admissibility of evidence in child custody cases. Nevertheless, "the specific exclusionary rules and other provisions, however, shall be applied only to the extent that they tend to promote the purposes of the proceeding." *Id.* "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. La.Code Evid. art. 401. Evidence which is not relevant is not admissible." *Id.* "'Relevant evidence'" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probable than it would be without the evidence." La.Code Evid. art. 401.

Appellate courts have held that a parent's arrests are relevant to their moral fitness to parent a child. In *Fernandez v. Pizzolato*, 04-1676 (La.App. 4 Cir. 4/27/05), 902 So.2d 1112, the mother argued it was error for the trial court to exclude

11

evidence of the father's prior DWI arrests. In finding that the trial court erred in excluding the evidence, the appellate court stated:

> In the instant case, the arrest records were to be used . . . to show that he had used alcohol and prescription drugs in such a way that he could cause injury to others, including [his daughter], if she were riding in a vehicle with him. This evidence was directly relevant to his the issue of what was in the best interest of [the child.] Therefore, the evidence should have been admitted into evidence and to refuse to allow the evidence to be admitted was legal error on the part of the trial court judge.

Similar to the facts in this case, the appellate court found that although the trial court excluded evidence of the arrests, it knew of Fernandez's arrests, thus it was harmless error to have excluded the evidence.

In *Long v. Dossett*, 98-1160 (La.App. 3 Cir. 4/28/99), 732 So.2d 773, *writ denied*, 99-1377 (La. 6/4/99), 745 So.2d 13, another case involving the father's arrest for DWI, the trial court mentioned that the father's arrest had appeared in the newspaper. The father argued that the arrest was not relevant. On appeal, a panel of this court held:

> Given the history of convictions that Appellant has with drinking and driving and the proximity of the arrest to trial, we find that such evidence is very much relevant to the La.Civ.Code art. 134(6) consideration of moral fitness of the parties. Additionally, we emphasize the appropriateness of the lower court's forthright method of alerting the attorneys of information that had been brought the attention, not only to the judge, but to public at large through publication.

*Id.* at 786.

In another case before this court, *Gautreau v. Gautreau*, 96-1548 (La.App. 3 Cir. 6/18/97), 697 So.2d 1339, *writ denied*, 97-1939 (La. 11/7/97), 703 So.2d 1272, the mother had been arrested twice for DWI and a third time for DWI, possession of marijuana, and possession of Xanax. On appeal, this court held that there was no error in the trial court's admission of a trooper's testimony concerning

12

an accident at which he was not present.[3]  A panel of this court cited La.Code Evid.art. 1101(B)(2) and found that "our jurisprudence has consistently held that whether evidence is relevant and admissible is within the discretion of the trial judge. His ruling will not be disturbed on appeal in the absence of a clear abuse of discretion" (citation omitted). *Id.* at1346.

Accordingly, we find the testimony and records concerning R.G.P.'s arrest in March 2008, for carnal knowledge of a juvenile (Tensas Parish) and contributing to the delinquency of a juvenile (Franklin Parish) should have been properly admitted.  The fact that R.G.P. was arrested for having sex with a fifteen-year-old girl following a night of mud-riding at his camp, is highly relevant to his moral fitness to parent the triplets.  Additionally, his citation in May 2008, for possession of drug paraphernalia was also relevant to his moral fitness.

Even excluding the arrest for carnal knowledge of a juvenile, we still find the evidence overwhelming that it is not in the triplets' best interest that R.G.P. be named their primary domiciliary parent.  There is no doubt that R.G.P. has an ongoing drug problem for which he has been in court-ordered rehabilitation that was clearly unsuccessful.  There is no doubt that he continues to associate with known drug users.  Unlike R.P., the fact that he may not use drugs in front of the triplets does not dissuade us from the belief that this type of behavior is detrimental to his impressionable teenaged daughters nor are we convinced that the effects of his substance abuse issues do not affect his family life. Thus, as we previously mentioned, we find the trial court abused its discretion in considering R.G.P.'s arrests, yet in still finding that it was in the triplets' best interests that they reside with

---

[3]We are uncertain if the "accident" referred to involved the latest arrest for DWI and possession.  It is unclear from the opinion.

13

him as domiciliary parent with his mother's supervision.

## DRUG TESTING/FIFTH AMENDMENT PRIVILEGE

In this assignment of error, L.E.P.S. argues that the trial court erred in refusing to drug test R.G.P. and failing to apply an adverse inference against him after he took the Fifth Amendment privilege thirty-one times during testimony.

Louisiana Revised Statute 9:331.1 states:

> The court for good cause shown may, after a contradictory hearing, order a party in a custody or visitation proceeding to submit to specified drug tests and collection of hair, urine, tissue, and blood samples as required by appropriate testing procedures within a time period set by the court. The refusal to submit to the tests may be taken into consideration by the court. The provisions of R.S. 9:397.2 and 397.3(A), (B), and (C) shall govern the admissibility of the test results. The fact that the court orders a drug test and the results of such test shall be confidential and shall not be admissible in ay other proceedings. The court may render judgment for costs of the drug tests against any party or parties, as it may consider equitable.

Although we find that good cause was shown, this issue is rendered moot by the fact that there was no doubt in the record that R.G.P. has an ongoing drug problem. For the same reasons, the issue of the application of a negative inference was not necessary due to the overwhelming evidence that it was not in the children's best interests to be placed in R.G.P.'s custody.

## CUSTODY/RELOCATION

Assignments of error numbers three, four, and five all pertain to the trial court's award of joint custody to L.E.P.S. and R.G.P., with R.G.P. being named domiciliary parent subject to his mother's supervision, and the denial of L.E.P.S.'s request to relocate the triplets to Arizona. We note that there is no statutorily mandated visitation schedule in the record in favor of L.E.P.S. as required by La.R.S. 9:335.

14

On appeal, L.E.P.S. argues that she should have been awarded sole custody and that she proved that relocation is in the triplets' best interest . Having found that the trial court abused it discretion in its custody/relocation determinations and based on our review of the record we find that an award of joint custody with L.E.P.S. being named the primary domiciliary parent would be in the triplets' best interest. Moreover, we find that L.E.P.S. proved that relocation of the triplets to Yuma, Arizona was made in good faith and is in their best interest.

A trial court's determination of child custody is entitled to great weight on appeal and will not be disturbed absent a clear abuse of discretion. *AEB v. JBE,* 99-2668 (La.11/30/99), 752 So.2d 756. The trial court shall award custody of children in accordance with their best interests. La.Civ.Code art. 131. The best interests of the child are the paramount consideration of the court. *Deason v. Deason,* 99-1811 (La.App. 3 Cir. 4/5/00), 759 So.2d 219. Pursuant to La.Civ.Code art. 134, the factors to be considered when determining the child's best interest include:

(1) The love, affection, and other emotional ties between each party and the child.

(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(4)  The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(6) The moral fitness of each party, insofar as it affects the welfare of the child.

(7)    The mental and physical health of each party.

(8)    The home, school, and community history of the child.

(9)    The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(10)    The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

(11)    The distance between the respective residences of the parties.

(12)    The responsibility for the care and rearing of the child previously exercised by each party.

An additional issue is the relocation of the children to Yuma, Arizona. We note at the outset that relocation is governed by its own set of factors that must be considered. This raises the possibility of an interesting scenario where conflicting results could be reached in custody determinations. For example, it could be possible to find that it was in the best interests of a child to be in one parent's custody, yet find that relocation is not. Fortunately, we need not address that issue here. Moreover, we find that factor twelve ("Any other factors affecting the best interest of the child") necessarily includes an overall look at all of the relevant factors.[4] In these particular circumstances, even if relocation is not ideal, it would be outweighed by the fact that the best interests of the child are served by residing with a relocating parent.

Louisiana Revised Statute 9:355.12 lists the factors that shall be considered in a contested relocation:

(1)    The nature, quality, extent of involvement, and duration of the of the child's relationship with the parent proposing to

---

[4]In the recent case of *Johnson v. Spurlock*, 07-0949 (La.App. 5 Cir. 5/27/08), 986 So.2d 724, *writ denied*, 08-1400 (La. 7/25/08), 986 So.2d 670, the appellate court found it was error for the trial court to only consider the best interests of the child without a recitation of the La.R.S. 9:355.12 factors.

relocate and with the nonrelocating parent, siblings, and other significant persons in the child's life.

(2)     The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child.

(3)     The feasibility of preserving a good relationship between the nonrelocating parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.

(4)     The child's preference, taking into consideration the age and maturity of the child.

(5)     Whether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the nonrelocating party.

(6)     Whether the relocation of the child will enhance the general quality of life for both the custodial parent seeking the relocation and the child, including but not limited to financial or emotional benefit or educational opportunity.

(7)     The reasons of each parent for seeking or opposing the relocation.

(8)     The current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child.

(9)     The extent to which the objecting parent has fulfilled his or financial obligations to the parent seeking relocation, including child support, and community property obligations.

(10)    The feasibility of a relocation by the objecting parent.

(11)    Any history of substance abuse or violence by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation.

(12)    Any other factors affecting the best interest of the child.

B. The court may not consider whether or not the person seeking

17

relocation of the child will relocate without the child if relocation is denied or whether or not the person opposing relocation wil also relocate if relocation is allowed.

Louisiana Revised Statute 9:355.13 sets forth the burden of proof of the relocating parent as follows:

The relocating parent has the burden of proof that the proposed relocation is made in good faith and is in the best interest of the child. In determining the child's best interest, the court shall consider the benefits which the child will derive either directly or indirectly from an enhancement in the relocating parent's general quality of life.

In reviewing the trial court's reasons for ruling and the record as a whole, we have no doubt that it abused its discretion in naming R.G.P. the primary domiciliary parent, subject to his mother's supervision. We find the trial court's written reasons for ruling factually inaccurate, and we furthermore find that it buttresses the argument that it is not in the best interest of the triplets that their father be named the domiciliary parent.

**BEST INTERESTS**

In considering all of the relevant facts, we find it is in the triplets best interests that joint custody be awarded with L.E.P.S. being named the primary domiciliary parent. Because of the strong ties with their father, paternal grandmother, and maternal grandparents, we decline to award L.E.P.S. sole custody in order that visitation with extended family in the Concordia/Catahoula area can be maintained.

*Factor one-* The triplets, their maternal grandparents, and paternal grandmother, all testified that they have a close relationship. That fact is not in doubt. Further, it is further clear that they love their mother and father. The girls all expressed a desire to remain in their mother's custody; they just did not want to move to Arizona. It is clear that the triplets have a close relationship with all of their

18

extended family.

Factor two- We find that L.E.P.S. is in a superior position to give the girls love, affection, and spiritual guidance and to continue the education and rearing of the children. Contrary to the trial court's finding, we could find no testimony by the girls regarding close ties with local churches. R.G.P. did not testify as to the girls educational needs and how he would support them, although his mother did. R.G.P. provided little insight as to how he would parent these children, and again, testified that he did not know who would make the better parent. L.E.P.S., a school teacher, is clearly the more qualified parent in this regard.

Factors three and twelve- It is clear that both parties have the financial means to provide the girls with food, clothing, medical care, and other medical needs. However, it is also clear that for the past ten years, L.E.P.S. has been the party who has taken care of all of these needs on a day-to-day basis.

Factors four and five-The triplets have resided with their mother as primary domiciliary custodian for more than ten years. R.G.P. has never been the primary domiciliary parent.

Factor eight- It is true that the girls are involved in activities in the area and at their school. We note, however, that the girls lived in the Slidell area for a few years until Hurricane Katrina hit, at which time they moved back to the Jonesville area. Thus, it is clear that the girls can make new friends and engage in sports activities wherever they live.

Factor nine- Although the trial court should consider the children's wishes in awarding custody, it should not disregard overwhelming evidence that it would not be in their best interest to have their desires come to fruition. A child's

wishes may not be in her best interests. *See Richardson v. Richardson,* 01-0777 (La.App. 1 Cir. 9/28/01), 802 So.2d 726, *writ denied*, 01-2884 (La. 11/16/01), 802 So.2d 618 (twelve-year old's desire to remain in Louisiana where his friends and family were located insufficient to show it was not in his best interests to move out of state.) We find this is clearly the case here.

*Factor ten-* The trial court found that L.E.P.S. did not facilitate and encourage a close and continuing relationship between the girls and their father. We disagree and are unable to find any evidence of that in the record. Admittedly, we were not in court to assess witness demeanor. However, the fact that L.E.P.S.'s former mother-in-law has sued her for custody of her children because "she moves around a lot" would certainly lead to a contentious and bitter feeling on L.E.P.S.'s part. Moreover, our cold review of the record leads us to conclude that the custody proceedings are spearheaded by R.P., as opposed to her son. Moreover, this custody issue is between R.G.P. and L.E.P.S., not L.E.P.S. and R.P.

*Factor eleven-* Although the new custody arrangement greatly increases the distance between the two parties, it is clear that the distance will not be a financial hardship for R.G.P.

*Factors six and seven-* Irrespective of all of the other factors, we find that factors six and seven overwhelmingly mitigate in favor of awarding L.E.P.S. custody. We disagree with the trial court's award of custody to a man who admittedly has an ongoing substance abuse problem, who has several criminal investigations pending against him, and who testified in open court that "he's not sure who should get custody" of the girls. Contrary to the trial court's conclusion, one of the triplets even admitted that she worries about her father's drinking and substance abuse issues.

20

R.G.P.'s ongoing substance abuse problems and his arrest for carnal knowledge of a juvenile the same age as his daughters leaves us with no doubt that his moral fitness as a parent is called into question. Again, his ambivalence about the custody of the girls clearly shows that he is not the party pushing for custody of them. Moreover, as an ongoing drug user, his mental and physical health are called into question.

## RELOCATION

*Good Faith*

We find that L.E.P.S. has shown that the relocation was made in good faith. Her husband has a secure job in the Yuma area with the federal government. L.E.P.S. testified that there were no job openings closer to the Catahoula area. She further testified that she will not have to work and will be available to assist her daughters and care for her infant grandson.

*Best Interests/La.R.S. 9:355.13 Factors*

We have discussed the majority of the 9:355.13 factors above, but make special note of factors six, seven, and eleven. Having reviewed all of the evidence, we find the relocation will enhance both L.E.P.S.'s and the children's lives. The home they will be living in is very large and can easily accommodate the triplets along with their half sister, two step-sisters, and V.P.'s son. L.E.P.S. testified to her husband's salary, which can support the family and allow L.E.P.S. to not work. We find this situation is greatly advantageous over the previous one in which, following Hurricane Katrina, L.E.P.S. was temporarily residing in a two- bedroom rental trailer owned by her father. As to factor seven, R.G.P. did not testify as to why he objected to the relocation. In fact, he was unsure of what would be in the triplets' best interest. Finally, factor eleven weighs heavily in favor of allowing the relocation. It is very

21

clear that R.G.P. has an ongoing substance abuse problem that is has led to severe consequences. It is further clear that rehabilitation has not been successful and that his own daughters worry about his substance abuse issues. For this reason alone, we find that relocating the triplets to a new environment free from these concerns and the behaviors that go along with a parent who has substance abuse issues, would be overwhelmingly in their best interest. Although we decline to discuss the legal ramifications of what was essentially an award of custody to the grandmother in lieu of the mother, we do not find that R.G.P.'s mother's "supervision" mitigates R.G.P.'s total lack of moral fitness and desire to parent these triplets. In this case, the appointment of R.P. as "supervisor" does not qualify as the silver lining to an otherwise dark cloud.

We further note that the triplets will be of majority shortly and will be able to decide for themselves where they would like to reside. In the meantime, we find the opportunities available in Yuma and L.E.P.S.'s continuing stable parental influence would be in their best interests. Accordingly, we award joint custody to L.E.P.S. and R.G.P., subject to his mother's supervision, pending the outcome of the criminal charges against him, with L.E.P.S. being named the primary domiciliary parent. L.E.P.S. further may relocate the children to Yuma, Arizona. We remand this case for a determination of an appropriate visitation schedule noting that the triplets remain with their mother throughout the school year, with an appropriate holiday and summer visitation schedule to be determined by the trial court pursuant to La.R.S. 9:335.

## CONCLUSION

The judgment of the trial court awarding the defendant-appellee, R.G.P.,

22

primary domiciliary custody subject to the  supervision of his mother is hereby reversed.  The appellant, L.E.P.S., is hereby named the primary domiciliary parent. Additionally, her request to relocate the children is granted.  The trial court is ordered to formulate a summer and holiday custody arrangement pursuant to La.R.S. 9:335. All costs of this appeal are assessed against R.G.P.

**REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

L.E.P.S. vs R.G.P.

**COOKS, J. CONCUR IN PART AND DISSENT IN PART.**

I concur with the majority ruling naming L.E.P.S. the domiciliary parent, and granting her request to relocate to Arizona. I strongly disagree with the majority decision to award joint custody to L.E.P.S. and R.G.P. **Custody should be awarded solely to L.E.P.S.** Any visitation with this father should await a hearing after a full evaluation of the father's fitness to visit with his children supervised or otherwise. *See* La. C.C. art. 136. I would remand with instruction for the trial court to order an evaluation by a qualified expert and thereafter conduct an appropriate hearing.

I have no doubt that the father's persistent drug and alcohol abuse has not helped in his relationship with these children. To the contrary, it has set an extremely bad example for these young girls. Now, to add to that very bad example, these 15 year old girls' forty some year old father is charged with sexual molestation of a 15 year old girl and involving that child with the use of illegal drugs as well, while joy riding with her at his camp where he spends time with his daughters. [ Now, we are left to trust his mother to "supervise him" as he visits with his girls, a job she has not been able to do thus far in his life.]

The majority, based on much evidence in the record, correctly finds the father is morally unfit, and points to "overwhelming" evidence that awarding custody to the father is not in the best interest of these young girls. Yet, a few lines later the majority awards him joint custody. The majority's award of joint custody appears nothing more than an effort, albeit well intended, to allow visitation with the grandmother, and to avoid the holding in *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054 (2000).

-1-

The visitation rights of grandparents are set forth in La. R.S. 9:344. None of the limited circumstances set forth therein which permit an award of visitation to grandparents exist in this case. The father of these children has not died, been incarcerated nor interdicted. Additionally, there is nothing in the record to suggest the mother will not allow the girls to visit their paternal grandmother as willingly done in the past.

NUMBER 08-1349

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

L.E.P.S.

VERSUS

R.G.P.

PAINTER, J., dissenting.

I respectfully dissent from the majority's opinion reversing the trial court's award of custody of fifteen-year-old triplet daughters to the father, with the father being named domiciliary parent, subject to the mother's supervision. The majority finds that the best interests of the children require that joint custody be awarded with the mother being named the primary domiciliary parent. It is my opinion that reversal is not warranted.

The standard of review in child custody matters has been clearly stated by this court:

> The trial court is in a better position to evaluate the best interest of the child from its observances of the parties and witnesses; thus, a trial court's determination in a child custody case is entitled to great weight on appeal and will not be disturbed unless there is a clear abuse of discretion.

*Hawthorne v. Hawthorne*, 96-89, p. 12 (La.App. 3 Cir. 5/22/96), 676 So.2d 619, 625, writ denied, 96-1650 (La.10/25/96), 681 So.2d 365.

The burden of proof on a party seeking to modify a prior permanent custody award is dependent on the nature of the underlying custody award.

> When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child."

*Bergeron v. Bergeron*, 492 So.2d 1193, 1200 (La.1986). And "there must be a showing of a change in circumstances materially affecting the welfare of the child before the court may consider making a significant change in the custody order." *Id.* at 1194. However, as in this case, where the original custody decree is a stipulated judgment (i.e., the parties have consented to a custodial arrangement), the heavy burden of proof enunciated in *Bergeron* is inapplicable. *Hensgens v. Hensgens*, 94-1200 (La.App. 3 Cir.), 653 So.2d 48, *writ denied*, 95-1488 (La.9/22/95), 660 So.2d 478.

While the mother in this case did not have to meet the *Bergeron* standard, she still had to show that there was a change in circumstances and that the new custody arrangement would be in the best interest of the children. The trial court noted the triplets desire to remain in the home with their father and paternal grandmother. The trial court also took into consideration the mother's failure to display a willingness to facilitate and encourage any relationship between the triplets and their father. The trial court concluded that the mother tended to use relocation attempts to thwart any relationship between the triplets and their father. Therefore, I find that the mother did not meet her burden of proof and that because of the great weight to which the trial court's judgment is entitled, we cannot reverse its decision under the applicable standard of review.